# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRANK DISMORE,             )
                                    )
                Plaintiff,     )   No. 06-437 (SLR)
     v.                           )
                                      )
SEAFORD SCHOOL DISTRICT,     )
                                    )
                Defendant.   )

**DEFENDANT SEAFORD SCHOOL DISTRICT'S OPENING BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

BUCHANAN INGERSOLL & ROONEY

Alfred J. D'Angelo, Jr., Esquire (#2164)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
alfred.dangelo@bipc.com
jennifer.becnelguzzo@bipc.com

*Attorneys for Defendant Seaford School
District*

May 24, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

NATURE AND STAGE OF THE PROCEEDING ...................................... 1

SUMMARY OF THE ARGUMENT ............................................................ 2

STATEMENT OF FACTS ............................................................................ 3

ARGUMENT .................................................................................................. 7

I.   DISMORE HAS FAILED TO MEET HIS BURDEN AND SUMMARY
     JUDGMENT SHOULD BE GRANTED IN FAVOR OF SEAFORD. ............ 7

II.  DISMORE CANNOT ESTABLISH A PRIMA FACIE
     CASE OF DISCRIMINATION. ............................................................. 8

     A.   *Dismore is not disabled.* ............................................................ 8

          1.   Dismore's alleged mental impairment does not substantially
               limit his ability to perform all major life activities. ............................ 9

          2.   There is no record of Dismore's alleged disability. ......................... 11

          3.   Dismore was not regarded as disabled. ............................................ 12

     B.   *Dismore is not qualified to drive school-age children.* ............................ 13

     C.   *Dismore has failed to establish that he was terminated because
          of his alleged disability; to the contrary, he was
          terminated for inappropriate conduct.* ....................................... 15

III. EVEN ASSUMING, ARGUENDO, THAT DISMORE HAS MET HIS
     BURDEN, HE CANNOT ESTABLISH THAT SEAFORD'S
     EXPLANATION FOR HIS TERMINATION WAS PRETEXTUAL. .......... 17

IV.  DISMORE'S ADDITIONAL CLAIMS LACK FACTUAL SUPPORT
     AND MUST BE DISMISSED. .............................................................. 18

     A.   *Dismore has not established a claim for retaliation.* ............................. 18

     B.   *Dismore cannot even recall the harassment that he claims occurred.* ..... 19

CONCLUSION ............................................................................................. 20

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999) ...................................................................7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .........................................................7

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*,
    98 F.3d 201 (3d Cir. 2002) ...............................................................................................7

*Daley v. Koch*, 892 F.2d 212 (2d Cir. 1989)........................................................................17

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ..................................................................17

*Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576 (3d Cir. 1998) .............................8, 13, 15

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ..............................................................................7

*Jones v. School District of Philadelphia*, 198 F.3d 403 (3d Cir. 1999).........................8, 17

*Lee v. Minner*, 458 F.3d 194 (3d Cir. 2006) .........................................................................7

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................................8, 17

*McGee v. Proctor & Gamble Distributing Co.*,
    45 F.Supp.2d 481 (E.D. Pa. 2006) ..................................................................................18

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)................................................19

*Morgan v. Secretary of Health and Human Services*, 2002 WL 732091 (D. Del.) ............7

*Saldana v. Kmart Corp.*, 260 F.3d 228 (3d Cir. 2001) .........................................................8

*Tice v. Centre Area Transportation Authority*, 247 F.3d 506 (3d Cir. 2001)..............11, 12

*Tribuani v. MBNA America Bank N.A.*, 2005 WL 885239 (D. Del.) ................................12

### Federal Statutes

42 U.S.C. § 12101..................................................................................................................1

42 U.S.C. § 12102..................................................................................................................8

**Federal Regulations**

29 CFR 1630.2(g)(1) ...............................................................................................9, 10, 12

**Rules**

Fed. R. Civ. P. 56...................................................................................................7

**State Regulations**

Del. Admin. Code 1105 3.1 ...............................................................................13

## NATURE AND STAGE OF THE PROCEEDING

Frank Dismore ("Dismore") was terminated as a school bus driver in Seaford School District ("Seaford" or the "District") on September 30, 2005, as a result of two incidents – offering condoms to two young girls on his bus route and sending text messages to another young girl who rode his bus. On November 15, 2005, Dismore filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging that Seaford terminated his employment as a result of his alleged disability. After completing its investigation, the EEOC concluded that Dismore failed to establish discrimination and issued Dismore a right to sue letter. A copy of the Right to Sue letter is attached as Exhibit A.

Following receipt of the letter, Dismore initiated this action by filing a complaint (the "Complaint") in the Superior Court of the State of Delaware in and for Sussex County on or about June 1, 2006, alleging violations of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et. seq.* Seaford timely removed the case to this Court on July 19, 2006 as the Complaint asserted federal claims and answered the Complaint on July 28, 2006. This is Seaford's Opening Brief in Support of its Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

1.      Dismore has failed to establish the elements of a *prima facie* case of discrimination.  Dismore has not presented evidence establishing that he suffers from an impairment that substantially limits a major life activity or that he was regarded by Seaford as having such an impairment.  Further, because Dismore's inappropriate behavior and poor judgment poses a risk to young children, he is not qualified to drive a school bus.  Finally, Dismore cannot establish that his termination was the result of discrimination.

2.      Seaford terminated Dismore because he offered condoms to young girls and sent text messages to another female student.  Seaford's reasons for terminating Dismore were legitimate, appropriate and non-discriminatory.  Dismore cannot demonstrate otherwise.

3.      Dismore has failed to produce any evidence supporting his retaliation and hostile work environment claims.  The alleged retaliation occurred after his termination and Dismore was unable remember any facts supporting his hostile work environment claim.

# STATEMENT OF FACTS[1]

Plaintiff Frank Dismore ("Plaintiff" or "Dismore") was hired by John and Blanche Gundry (the "Gundrys") in 2003 as a school bus driver. The Gundrys contracted with Seaford School District ("Seaford" or the "District") to provide bus service for students in the District.[2] From August 2003 until his termination on September 30, 2005, Dismore drove two bus routes per day transporting Seaford students ranging in age from kindergarten through the 12th grade.

The parties agree that two incidents between Dismore and female students led to Dismore's termination as a bus driver in Seaford. The first, in May 2005, involved Dismore offering condoms to two female high school students. According to Dismore, he overheard a conversation between two girls, approximately 14 or 15 years old, in which they were discussing sex. Dismore alleges that at some point one of the girls asked Dismore what a douche was, to which he provided a response. Frank Dismore deposition transcript at 38 (excerpts attached as Exhibit B). Approximately one or two weeks later, Dismore again overheard the girls discussing sex, between themselves, but this time decided to intervene in the conversation on his own. Dismore Dep. at 39-40. After letting the brother of one of the girls off at his usual stop,[3] Dismore, alone with the two girls on the bus, offered them condoms:

> Q:    When you offered the girls condoms, were they alone with you on the bus?
> A:    Yes.
> ***

---

[1]    Plaintiff's version of the facts are presented as true only for the purposes of this Summary Judgment Motion.

[2]    For purposes of this motion, Seaford will treat itself as Dismore's employer. However, Dismore was not a Seaford employee, but rather was employed solely by the Gundrys.

[3]    The sister of this boy also should have exited the bus at that time, but Dismore kept her on the bus.

Q:    Did you let one of their brothers off of the bus?
A:    Yes.
Q:    Did you let him off at his normal stop?
A:    Yes.
Q:    Should the girls have gotten off at that stop?
A:    One of them would have, yes.
Q:    But she did not get off:
A:    Yeah. She did eventually, yes.
Q:    So you let the brother off and then these two girls remained on the bus with you?
A:    Mm-hmm.
Q:    14- or 15-year old girls?
A:    Mm-hmm.
Q:    And you were how old at the time? Maybe 49, 50 years old?
A:    Yeah.
Q:    And with two young, teenage girls alone on the bus with you, you offered them condoms?
A:    Yeah.

Dismore Dep. at 40-42.

Not surprisingly, after the girls reported the incident to their families, Seaford was informed of Dismore's improper behavior and arranged a meeting with Dismore to discuss the incident. Mr. Lawrence Saltarelli, Seaford's transportation supervisor, and the Gundrys explained to Dismore that offering condoms to students was inappropriate under any circumstances, and, if he heard such conversations in the future, he was to speak to Mr. Saltarelli or the wellness center at Seaford. Dismore Dep. at 44. Dismore acknowledged that his behavior was wrong and agreed to follow the protocol. Dismore Dep. at 45. Seaford adjusted the bus route to ensure these girls were never alone with Dismore.

However, on September 30, 2005, Dismore was again caught behaving inappropriately with a Seaford student. This time, a female middle school student advised her assistant principal that Dismore sent four text messages from his cell phone

to her cell phone on September 29, 2005. While there is a dispute about how Dismore

obtained the student's cell phone number,[4] there is no dispute that Dismore sent 4 text

messages to the student during school hours without her permission. Dismore Dep. at 46.

When asked to explain why he sent the messages, Dismore responded that he wanted to

text message her because they had never text messaged before. Dismore Dep. at 50. And

although Dismore now says that he did not think he was doing anything inappropriate by

text messaging a middle school student, his behavior immediately after the fact says

otherwise:

> Q:     Do you know how Mr. [Saltarelli] found out that it
> was you who had text messaged the student?
> A:     He called me.
> Q:     He called the cell phone number?
> A:     Yeah.
> Q:     Did you answer the phone?
> A:     No. I think a friend of mine at school answered it.
> Q:     Did he pass the phone to you?
> A:     Yeah.
> Q:     And what did you say to Mr. [Salterelli] initially?
> A:     Probably like hi or something like that, but I can't
> remember.
> Q:     Did he ask you if that was your cell phone?
> A:     Yeah.
> Q:     Did he ask if you had used it to text message?
> A:     I don't think we got to that point. I think he was
> just saying something about "We're doing an investigation
> and this number had come up" and, you know, that was the
> extent of it.
> Q:     You initially denied to Mr. [Saltarelli] that that was
> your cell phone, correct?
> A:     Yeah.
> Q:     Why did you deny that that was your cell phone?
> A:     I just didn't understand what was going on.

---

[4]    The student says Dismore asked her for her cell phone number in case she was running late. *See*
Incident report prepared by Assistant Principal (copy attached as Exhibit C). Dismore contends that
sometime prior to this incident he gave his cell phone number to the student to call if she needed the
bus to wait for her. Dismore claims he got her phone number when she called him sometime prior to
the text messaging incident. Dismore Dep. at 47. For purposes of this Motion only, Seaford will
accept Dismore's account as true.

> Q:   Well, you understood that he asked if that was your cell phone?
> A:   Yes.
> ***
> Q:   And your response was "No, it's not" even though it was your cell phone, correct?
> A:   Yes.

Dismore Dep. at 53.

After investigating this second incident and determining that Dismore had, in fact, initiated the text messages, Mr. Saltarelli met with Dismore on September 30, 2005 and advised Dismore that, because of his inappropriate behavior with students, he was no longer permitted to drive a school bus in the District.  Dismore Dep. at 56.  The Gundrys terminated Dismore's employment with them shortly thereafter.[5]  Dismore has retained other employment and is currently taking classes at Delaware Technical and Community College ("Del Tech").  Dismore Dep. at 6-13.

---

[5]   Dismore has worked for the Gundrys since this time in other capacities, specifically driving vehicles for their farm operation.

**ARGUMENT**

Frank Dismore was terminated from his position as a school bus driver for Seaford School District because he behaved improperly with young girls on his bus route. While he now claims that Seaford discriminated against him because he is allegedly disabled, he has presented no evidence establishing a disability and no evidence showing that Seaford's stated reasons for his termination are pretextual. Accordingly, Dismore's Complaint should be dismissed in its entirety with prejudice.

**I.    DISMORE HAS FAILED TO MEET HIS BURDEN AND SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF SEAFORD.**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the entry of summary judgment where the pleadings and supporting materials demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Lee v. Minner*, 458 F.3d 194, 197 (3d Cir. 2006). The mere existence of *some* factual dispute is not enough to defeat a motion for summary judgment; the factual dispute must be both genuine and material. *Morgan v. Secretary of Health and Human Services*, 2002 WL 732091, *4 (D. Del.) (copy attached as Exhibit D) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). The Third Circuit has held that "[a] factual dispute is material if it bear[s] on an essential element of the Plaintiff's claim" and "is genuine if a reasonable jury could find in favor of the non-moving party." *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 298 F.3d 201 (3d Cir. 2002) (*quoting Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999)). Thus, to survive a motion for summary judgment, the party contesting the motion must demonstrate that there exists "a dispute over facts that might affect the outcome of the suit." *Morgan*, 2002 WL 732091,

at *4, n.7. The non-moving party may not merely rely on "bare assertions, conclusory allegations or suspicions," but must set forth specific evidence showing there is a genuine issue for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 231 (3d Cir. 2001).

Because there are no genuinely disputed facts that would preclude entry of judgment in favor of Seaford and Dismore has failed to meet his burden of establishing necessary elements of his claim, summary judgment should be granted in favor of Seaford.

## II. DISMORE CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION.

In order to establish a *prima facie* case of discrimination, Dismore must prove that he (1) is "disabled" as that term is defined by the ADA; (2) is otherwise qualified to perform the essential functions of the job; and (3) has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). If Dismore is able to make out a *prima facie* case, pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burden shifts to Seaford to establish that Dismore was terminated for non-discriminatory reasons. *See Jones v. School District of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). The burden then shifts back to Dismore to prove that Seaford's stated reasons are pretextual. *Id.*

### A. Dismore is not disabled.

In order to qualify as a disabled individual under the ADA, Dismore must establish that (1) he has a physical or mental impairment that substantially limits one or more of his major life activities or (2) he has a record of such an impairment or (3) he was regarded as having such an impairment. *See* 42 U.S.C. § 12102(2). Dismore is

unable to establish any of these elements, and, thus, fails to establish a *prima facie* case of discrimination.

    1.    <u>Dismore's alleged mental impairment does not substantially limit his ability to perform all major life activities.[6]</u>

In his Complaint, Dismore alleges that he is "mentally challenged" and that he suffers from a "mental disability," Complaint, ¶¶ 2, 4, and explained at his deposition:

> I'm learning challenged, mentally challenged, sometimes referred to as mentally challenged. I just – my comprehension is not normal, whatever you want to call it.

Dismore Dep. at 16. The Federal Regulations define mental impairment as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 CFR 1630.2(h)(2). While Dismore seems to believe that he suffers from a mental impairment, a fact with which Seaford does not quarrel for purposes of this motion only, his alleged impairment apparently is not as severe as he believes. *See* Report to James Carter from Adolf Angermeier, January 6, 2003 ("Angermeier Report") ("I am not sure whether the present picture that he presents on the MMPI is somewhat related to him seeing himself as more impaired than in fact he objectively may be.") (copy attached as Exhibit E).

Specifically, Dismore claims to suffer from depression, ADD, and a learning impairment. Dismore Dep. at 8, 24. However, Dismore could offer little explanation as to how these alleged mental impairments impacted his life, much less how the impairments substantially limited his ability to perform major life activites. Dismore contends that his alleged mental impairment causes him to make "spontaneous

---

[6]    While Seaford disputes that Dismore suffers from a mental impairment and believes there is no evidence supporting the existence of a mental impairment, for purposes of this motion only, and because facts are to be viewed in a light most favorable to Dismore, Seaford will accept as true Dismore's assertion that he suffers from a mental impairment. Complaint, ¶ 2, Dismore Dep. at 16.

statements." Dismore Dep. at 26. When pressed for an example of a "spontaneous statement," Dismore gave two: (1) speaking out in class when he does not understand a concept and (2) responding to the statement, "How are you doing?" with "Well, I'm still breathing, but just tell me if I stop." Dismore Dep. at 27, 64. Dismore admits, however, that no doctors have attributed the "spontaneous statements" to his alleged mental impairment. Dismore Dep. at 28. Other than making spontaneous statements and stating that he "can only absorb so much" in class, Dismore was unable to point to any other way his alleged mental impairments affect him.

In order to be protected under the ADA, Dismore must not only establish that he suffers from a mental impairment, but also that the impairment substantially limits a major life activity. 29 CFR 1630.2(g)(1). The ADA Regulations identify the following as major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. *Id.* at (i). Moreover, substantially limited is interpreted very narrowly, requiring Dismore to provide that he is "[u]nable to perform a major life activity that the average person in the population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity . . . ." *Id.* at (j). Ample evidence exists showing that Dismore is able to perform all of these major life activities and is not substantially limited.

Dismore is able to care for himself and perform manual tasks. *See* Angermeier Report at 1. He is able to walk, talk, see, hear, and breathe. *Id.* He now lives with his elderly parents, but previously has lived on his own in California. Dismore Dep. at 5-6. Dismore is currently enrolled at Del Tech and has completed courses in Algebra, English,

Excel, Word, and Political Science since 2003.  Dismore Dep. at 7.[7]  Dismore is able to get along with and interact with others.  Dismore Dep. at 19.  Dismore is able to work and has held numerous jobs, both before and after working as a school bus driver for Seaford, including working as a package handler at Federal Express, as a stocker/cashier at Nylon Package Liquor Store, driving a truck for the Gundrys and serving as a work study in the computer lab at Del Tech.[8]  Dismore Dep. at 6-7, 11-13; *see also* Angermeier Report at 4 ("Intellectually [Dismore] certainly has the ability to do just about anything he can, with the emphasis being a career or a job where Writing and Reading are not the major issues.").

As Dismore has failed to establish that his alleged mental impairment substantially limits any of his major life activities, Dismore cannot meet his burden and Seaford's Motion should be granted.

2.    There is no record of Dismore's alleged disability.

Similarly, Dismore has presented no evidence that a record exists of an alleged disability.  While Dismore attempts to rely on school records from 1962 through 1973 in his claim that he suffers from a disability, those records were not available to Seaford when the decision to terminate Dismore was made and, further, do not establish that he suffers from a disability.  The records, at best, establish the existence of a mental impairment, but fail to go beyond that.  "A plaintiff attempting to prove the existence of a 'record' of disability still must demonstrate that the recorded impairment is a 'disability'

---

[7]    According to Dismore, he is given additional time to take tests at Del Tech.  Dismore Dep. at 86.

[8]    In order to be substantially limited in the major life activity of working, Dismore would have to establish that he is unable to perform more than one type of job.  *See Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 512 (3d Cir. 2001).  Dismore has not alleged that he is unable to perform any jobs.

within the meaning of the ADA." *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 513 (3d Cir. 2001). Moreover, no records exist between 1973 and 2003 pointing to any type of disability or mental impairment. Thus, records from 40 years ago which were not available to Seaford at the time of the employment decision and do not demonstrate the existence of a disability, are insufficient to establish a record of Dismore's alleged disability. *Id.*

3.    <u>Dismore was not regarded as disabled.</u>

Finally, Dismore has provided no evidence that Seaford believed he had a substantially limiting impairment at the time of his termination or at any time during his employment. *See* 29 CFR 1630.2(l); *Tice*, 247 F.3d at 514 ("For an individual to be 'disabled' under the 'regarded as' portion of the ADA's definition of disability, the individual must demonstrate either that (1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities."). An analysis of this claim focuses on Seaford's perception of Dismore, not on Dismore's abilities. *Tribuani v. MBNA America Bank N.A.,* 2005 WL 885239, *6 (D. Del.) (copy attached as Exhibit F).

Seaford was pleased with Dismore's work performance until the two incidents involving Dismore's inappropriate behavior with students and had no reason to believe Dismore was impaired or disabled. Dismore is well-spoken and, according to Dr. Angermeier, "project[s] a sense that he is a capable individual." Angermeier Report at 1; *see also* Dismore Dep. at 15 (Dismore quickly corrected counsel's misstatement regarding the agency with which Dismore filed his Charge of Discrimination).

12

Accordingly, there is no evidence establishing that Dismore was "regarded as disabled" by Seaford.

Dismore has failed to establish that he suffers from a disability or that Seaford regarded him as disabled. Accordingly, Dismore has failed to meet his burden and summary judgment should be granted in favor of Seaford.

### B. *Dismore is not qualified to drive school-age children.*

Assuming that Dismore is found to be "disabled," he must then establish that he is qualified to be a school bus driver. *Gaul*, 134 F.3d at 580. The primary function of a school bus driver is to keep the children he or she is transporting on the bus safe. Delaware State Regulations require school districts to have a policy stating that a "school bus driver is in full charge of the bus and pupils, has the authority of a classroom teacher and is responsible for the health, safety, and welfare of each passenger." 14 Del. Admin. Code 1105 3.1 (copy attached as Exhibit G). Thus, a bus driver who is unable to ensure the "health, safety and welfare" of the children on the bus simply is not qualified to be a bus driver.

In order to determine whether Dismore is "a qualified individual with a disability," the Court must not only consider whether Dismore satisfies the prerequisites for the position, but also whether he is able to perform the essential functions of the position with or without reasonable accommodation. *Gaul*, 134 F.3d at 580. Although Dismore successfully completed the school bus driver training courses and drove a school bus without incident from August 2003 through May 2005, because he is a potential danger to his young passengers, Dismore is not qualified to be a school bus driver.

13

Seaford does not dispute that Dismore appears to satisfy the prerequisites required for a school bus driver in terms of education and training, however Seaford strongly believes he is incapable of performing the essential function of maintaining the safety of the students with or without reasonable accommodation.[9]  In his deposition, Dismore acknowledged that he does not understand appropriate behavior with children:

> Q:    But you understood that Seaford terminated your employment or the Gundrys and Seaford terminated your employment because of your inappropriate behavior with children on the bus?
> A:    Eventually, yes.
> **Q:    Do you still have a problem understanding appropriate behavior with children?**
> **A:    Yeah.**
> **Q:    How can Seaford be sure that no other problems would occur if you remained as a school bus driver?**
> **A:    I don't know.**

Dismore Dep. at 72.

Someone who does not understand how to behave properly with children, specifically someone who does not understand that it is inappropriate to offer condoms to children and to text message young girls, is not qualified to drive a school bus full of young children.  Bus drivers are alone with students for extended periods of time and the children are in danger when a driver does not understand the limits applicable to communications with children.  Moreover, Seaford does not believe there are any reasonable accommodations that would render Dismore a "qualified individual," and, indeed, Dismore conceded that he was not aware of any accommodation that could have been implemented to protect the children on the bus from his behavior.  Dismore Dep. at 67-68.

---

[9]    In fact, Dismore and Seaford agree that there is no reasonable accommodation sufficient to protect children from his behavior.  Dismore Dep. at 67-68.

As Dismore is not a "qualified individual with a disability," he has failed to meet his burden of establishing a *prima facie* case, and Seaford's Motion should be granted

**C.    Dismore has failed to establish that he was terminated because of his alleged disability; to the contrary, he was terminated for inappropriate conduct.**

Even if Dismore was found to be a qualified individual with a disability, he still is unable to establish the final element of the *prima facie* case – that he was terminated as a result of his disability. *Gaul*, 134 F.3d at 580. In fact, Dismore was terminated because of his improper behavior with children on his bus, and he is unable to point to any facts establishing that his termination was for any other reason or that his behavior was linked to his alleged disability. Seaford and the Gundrys were pleased with Dismore's performance as a bus driver, which is why he was given a second chance after offering condoms to students on his bus. Yet, less than 6 months after Seaford and the Gundrys spoke to him about appropriate behavior with students, Dismore initiated text messages to a young, female student during school hours.

Of significance is the way Seaford learned of these incidents – the students involved went to authority figures (their parents and an assistant principal) to report their concerns. Indeed, the students knew Dismore's behavior was inappropriate and were concerned enough to report it. After this second incident, Seaford had no choice but to notify Dismore that he could no longer drive a bus in the District because of the District's concern over his behavior and the potential for that behavior to escalate to something very dangerous. The District's decision was communicated to Dismore within 48 hours after the second incident and immediately after Seaford conducted an investigation which confirmed the facts.

Not only did Seaford have an appropriate, non-discriminatory reason for terminating Dismore, but the District could not have had a discriminatory reason – no one even knew about Dismore's alleged disability.  Dismore Dep. at 33-34, 68.  It was only after Dismore's termination and the filing of Dismore's Charge of Discrimination with the EEOC that Seaford became aware of Dismore's belief that he suffered from a disability.  In fact, prior to this the only information on which Seaford could rely were forms Dismore completed prior to his employment as a bus driver.  Those forms lack any indication that Dismore suffered from any alleged disability.  *See* Delaware School Bus Driver Physical Examination and Medical Examination Report attached hereto as Exhibit H; Dismore Dep. at 70-71.

Dismore now contends that despite the fact that he did not disclose his alleged disability to Seaford or the Gundrys during his employment, Seaford should have known about it because of school records from Dismore's childhood in 1964.  However, Dismore acknowledged that he did not know if Seaford was even still aware of student records from 1964.[10]  Dismore Dep. at 33.  In fact, Seaford was not aware of these records and they were not involved in Seaford's decision to terminate Dismore.

Other than making a conclusory allegation that he was discharged because of his disability, Dismore has provided no evidence supporting this statement.  In fact, the only reason Seaford terminated Dismore was because of his inappropriate behavior with students on his bus.  *See* Memo to file, October 18, 2005 (copy attached as Exhibit  I).  Therefore, Seaford's Motion should be granted.

---

[10]    A search of Seaford's records after this lawsuit was filed revealed that Seaford did not maintain such education records.

III.    **EVEN ASSUMING, ARGUENDO, THAT DISMORE HAS MET HIS BURDEN, HE CANNOT ESTABLISH THAT SEAFORD'S EXPLANATION FOR HIS TERMINATION WAS PRETEXTUAL.**

Even if Dismore is able to make out a *prima facie* case of discrimination, which Seaford believes he cannot, the burden then shifts to Seaford to set forth a legitimate, non-discriminatory reason for Dismore's termination. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 198 F.3d at 410. As explained in section II.C, supra, Seaford terminated Dismore because he offered condoms to young girls on his bus and, after a final warning about his behavior, then sent text messages during school hours to another young girl on his bus. Dismore's actions constituted, at best, poor judgment, something which is not protected by the ADA, *see Daley v. Koch*, 892 F.2d 212, 215 (2d Cir. 1989), and he was terminated. Dismore has even acknowledged that he understood he was terminated as a result of his behavior with the children on the bus. Dismore Dep. at 72.

As Seaford has set forth a non-discriminatory reason for Dismore's termination, the burden shifts back to Dismore to prove by a preponderance of the evidence that the reasons offered by Seaford were not its true reasons, but instead were a pretext for discrimination. *Jones*, 198 F.3d at 412-13. In order to discredit Seaford's proffered reasons for his termination, Dismore must introduce evidence establishing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence[.]'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). The facts here speak for themselves – Dismore behaved inappropriately with students for the second time and was terminated after the investigation, and Dismore, confirmed the student's account of the facts. Dismore Dep. at 40, 46.

17

There can be no dispute that Seaford terminated Dismore as a result of his unacceptable behavior, not because of his alleged disability. Dismore has failed to meet his burden, and summary judgment should be entered for Seaford.

## IV.    DISMORE'S ADDITIONAL CLAIMS LACK FACTUAL SUPPORT AND MUST BE DISMISSED.

### A.    *Dismore has not established a claim for retaliation.*

Although it is not clear whether Dismore is actually asserting a claim for retaliation, he contends in his Complaint that "[r]etaliatory threats were made against me through third parties." Complaint, ¶ 10. To make out a *prima facie* case of retaliation, Dismore must prove: (1) that he engaged in a protected activity; (2) that Seaford took an adverse action against him; and (3) that there is a causal link between the activity and the adverse action. *McGee v. Proctor & Gamble Distributing Co.*, 445 F.Supp.2d 481, 490 (E.D. Pa. 2006). A cause of action for retaliation exists to prevent employers from taking adverse action against an employee who complains about discrimination, either officially or unofficially. *Id.*

Here, the only protected activity in which Dismore engaged was the filing of the Charge with the EEOC in November 2005 – more than six weeks after he was terminated. Thus, he cannot establish a causal link between the filing of the Charge and his termination. Moreover, the threats[11] about which Dismore complains occurred after his termination and also are not causally connected to his termination. Accordingly, to the extent Dismore is asserting a claim for retaliation, this claim should be dismissed as a matter of law.

---

[11]    Dismore never heard the alleged "threats," but rather heard about them through others. In fact, they were not threats at all, but rather, according to Dismore's testimony, statements by Mr. Saltarelli to the Gundrys that, because of Dismore's inappropriate behavior, he was not permitted to drive a bus in the District. Dismore Dep. at 73-74.

**B.     *Dismore cannot even recall the harassment that he claims occurred.***

Similarly, Dismore alleges in his Complaint that he experienced harassment in the workplace, but in his discovery responses and deposition could not provide any support for this statement. At his deposition, when asked to describe the harassment he alleges occurred, Dismore could not remember anything about the harassment, including whether a Seaford employee or someone else allegedly harassed him. Dismore Dep. at 77.

In order to establish a hostile work environment claim based on harassment, a plaintiff must establish that the harassment was sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations omitted). It is difficult to believe that the alleged harassment Dismore experienced rose to this level when he could not remember who harassed him, when he was harassed, where he was harassed or how the harassment occurred. Dismore Dep. at 77. Dismore bears the burden of proving the existence of harassment and a hostile work environment; a general statement that harassment occurred, without any supporting facts, is insufficient to meet this burden. Accordingly, Dismore's motion should be granted and Dismore's hostile work environment/harassment claim should be dismissed.

## CONCLUSION

Dismore was not terminated because of an alleged disability, and he knows that. Dismore was terminated from his position as a school bus driver for one reason – he posed a risk to the children he drove. School bus drivers are alone with students for periods of time, sometimes on isolated roads. When a bus driver offers condoms to young girls and sends text messages to another young girl, a school district has no choice but to remove that bus driver and the danger that driver poses to the students. To do otherwise would be a risk we simply cannot take with young children. Seaford's actions were non-discriminatory and absolutely appropriate. Seaford respectfully requests that this Court grant its Motion for Summary Judgment.

BUCHANAN INGERSOLL & ROONEY

Alfred J. D'Angelo, Jr., Esquire (#2164)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
alfred.dangelo@bipc.com
jennifer.becnelguzzo@bipc.com

*Attorneys for Defendant Seaford School
    District*

May 24, 2007

# EXHIBIT A

EEOC Form 161 (10/96)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Frank S Dismore
    1 Cross Gate Drive
    Seaford, DE 19973

From: Equal Employment Opportunity Commission
    Philadelphia District Office
    The Bourse
    21 S. Fifth Street, Suite 400
    Philadelphia, PA  19106-2515

*RECEIVED MAR 0 ? 2006*

[   ]   *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170-2006-00011 | Legal Unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[   ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[   ]   Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

      The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[   ]   We cannot investigate your charge because it was not filed within the time limit required by law.

[   ]   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[   ]   While reasonable efforts were made to locate you, we were not able to do so.

[   ]   You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[   ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[   ]   Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice**; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____
Marie M. Tomasso, District Director

February 28, 2006
*(Date Mailed)*

Enclosure(s)

Information Sheet

cc:   SEAFORD SCHOOL DISTRICT
      Larry Saltarelli, Transportation Supervisor

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


FRANK DISMORE,                          )
                                        )
            Plaintiff,                  )
                                        ) Civil Action
v.                                      ) No. 06-437 (SLR)
                                        )
SEAFORD SCHOOL DISTRICT,                )
                                        )
            Defendant.                  )


            Deposition of FRANK DISMORE taken
pursuant to notice at the law offices of Buchanan,
Ingersoll & Rooney PC, The Brandywine Building, 1000
West Street, Suite 1410, Wilmington, Delaware,
beginning at 1:10 p.m. on Monday, January 22, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

        JENNIFER M. BECNEL-GUZZO, ESQ.
        BUCHANAN INGERSOLL & ROONEY
          1000 West Street - Suite 1410
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:
        DeWITT BROWN, ESQ.



            WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



```
 1                        FRANK DISMORE,

 2              the deponent herein, having first been

 3              duly sworn on oath, was examined and

 4              testified as follows:

 5                        EXAMINATION

 6    BY MS. BECNEL-GUZZO:

 7      Q.    Could you please state your name for the

 8    record?

 9      A.    Frank, my middle name is Steglich, Dismore,

10    D-i-s-m-o-r-e.

11      Q.    What is your address?

12      A.    1 Crossgate Drive, Seaford, Delaware, 19973.

13      Q.    And your date of birth?

14      A.    April 25th, 1956.

15      Q.    Mr. Dismore, as I indicated before, my name is

16    Jennifer Becnel-Guzzo.  I'm the attorney representing

17    the defendant in this case, Seaford School District.

18              You're aware of that?

19      A.    Yeah.  Yep.

20      Q.    You have been sworn in by the court reporter.

21      A.    Uh-huh.

22      Q.    You understand that you're obligated to tell

23    the truth?

24      A.    Yeah.
```



1    for several years?

2        A.    Yeah.

3        Q.    When did you start taking that?

4        A.    Oh, God.  2004 maybe.

5        Q.    What about the ADD medication?

6        A.    That's been since about 2005, maybe.

7        Q.    Did you do anything to prepare for your

8    deposition today?

9        A.    No.

10       Q.    Did you look at any documents?

11       A.    No.  No.  I brought everything with me, but I

12   didn't look at anything, no.

13       Q.    Did you speak with anyone in preparation for

14   the deposition today?

15       A.    Just -- yes.  But only that I was coming up

16   here for a deposition, but I really had no idea what

17   was going to go on or how long it was going to take or

18   anything like that.  So it was just general.  Nothing

19   specific.

20       Q.    How long have you resided at your current

21   address?

22       A.    It's either four or five years.

23       Q.    Do you live by yourself?

24       A.    No.  I live with my parents.



```
 1       Q.    What was your address prior to the Crossgate

 2   Drive address?

 3       A.    3209 Coachman Road, that's C-o-a-c-h-m-a-n

 4   Road, Surrey Park, Wilmington, Delaware, 19803.

 5       Q.    How long did you live at that address?

 6       A.    Oh, about a year.

 7       Q.    And your address prior to the Coachman Road

 8   address, was that also in Wilmington?

 9       A.    No.   That was 21260 Mayan, M-a-y-a-n, Drive,

10   Chatsworth, C-h-a-t-s-w-o-r-t-h,, California, 91311.

11       Q.    How long were you at that address?

12       A.    Seven years.

13       Q.    Who is your current employer?

14       A.    Right now I'm working part time.   One is the

15   State of Delaware, Del Tech work study.   And the other

16   is Nylon, N-y-l-o-n, Package Liquor Store.   I think

17   the address is Sussex Avenue in Seaford, Delaware, the

18   same zip code, 19973.

19       Q.    You said you worked for the State of Delaware.

20   What do you do for the State of Delaware?

21       A.    It's college work study through Del Tech where

22   I'm going.

23       Q.    So those aren't two separate jobs.   That's one

24   job, the State of Delaware working for Del Tech?
```

1    A.    Yeah.  Yeah.  Yeah.  Yeah.  I'm sorry.  I

2    didn't mean to...

3    Q.    So your work study, is that part of a student

4    loan package?

5    A.    No.  It's just, you know, working at the

6    college.

7    Q.    What do you do at Del Tech?

8    A.    I work in the open computer lab assisting other

9    students, checking them in, checking them out.

10   Q.    Are you also a student at Del Tech?

11   A.    Yes.

12   Q.    How many classes are you taking right now?

13   A.    One.

14   Q.    What class is that?

15   A.    PowerPoint.

16   Q.    Is this the first class that you have taken at

17   Del Tech?

18   A.    No.  I have been there for several years.

19   Q.    And what are some of the other classes you've

20   taken at Del Tech?

21   A.    Elementary algebra, English, Excel, Word,

22   introduction to computers, political science.

23          There's others, but I just can't remember

24   them offhand.

8

1    Q.    Are you working toward a degree at Del Tech?

2    A.    I would like to but, you know, there's

3    problems.

4    Q.    What do you mean there are problems?

5    A.    Well, I have ADD.  I have, you know, other

6    situations that come up that make me difficult to

7    comprehend, you know, things.  It's like that algebra

8    course, I had to take it four times before I could

9    pass it.

10    Q.    That may not be that unusual actually --

11    A.    Well, I'm sorry.

12    Q.    -- based on people that I know who have

13    struggled with math.

14    A.    Well, it's...

15    Q.    You passed it then the fourth time you took it?

16    A.    Yeah.  It's just that it's not so much that it

17    was math, but it's like the one computer course I

18    remember going to I wasn't doing anything else, I

19    wasn't working anywhere else, 10:00 o'clock I was

20    falling asleep.  It was like...

21    Q.    Is that 10:00 o'clock in the morning?

22    A.    10:00 o'clock in the morning.  It was like I

23    just shut down.

24    Q.    Okay.  What about the other courses that you

1    have taken other than the algebra, how did you do in

2    your English course?

3        A.    I had to drop it.

4        Q.    So you never completed an English course at Del

5    Tech?

6        A.    No.

7        Q.    How have you done with your computer courses?

8        A.    Some okay.  You know, most of them okay.  I've

9    passed them eventually.

10       Q.    Have you had to take those more than one time?

11       A.    Yes.

12       Q.    And your PowerPoint class, is this the first

13   time you're taking PowerPoint?

14       A.    Yes.

15       Q.    How are you doing so far with that class?

16       A.    We're on lesson 2, so I really can't -- and

17   it's online so I can't really say.

18       Q.    Do you take most of your courses online or do

19   you attend in person?

20       A.    I prefer in person, but sometimes that option

21   is not available.

22       Q.    You said that you also work at a package store?

23       A.    Correct.

24       Q.    What is your position at the package store?

10

```
1        A.    Stocker/cashier, primarily stocking.  But

2   there's always two people, if somebody has to go to

3   the bathroom, you know, or something like that, you

4   know, but primarily it's stocking.

5        Q.    How long have you worked at that package store?

6        A.    Maybe three-and-a-half months.

7        Q.    And what is your salary there?

8        A.    7.50 an hour.

9        Q.    How many hours a week do you work?

10       A.    It varies.  You know, it can be anywhere

11  from -- I've told them I didn't want more than 10 or

12  15, but there's been days, there's been like

13  especially during Christmas I was up to 40, but

14  generally it's probably around 20.

15       Q.    How many hours a week do you work at Del Tech?

16       A.    16.5.

17       Q.    What is your salary there?

18       A.    7.60 an hour.  That's a -- it's something with

19  the State of Delaware.  They mandate that it's 7.60

20  whether you work one hour or fifty hours or whether

21  you work in the garage or the reception, it's 7.60.

22  It's a flat...

23       Q.    Part of the work study program?

24       A.    Yes.
```



1    Q.    How long have you worked for Del Tech?

2    A.    About three months.

3    Q.    And prior to starting work at the package store

4    and Del Tech, where did you work?

5    A.    I was driving a truck for the Gundrys

6    delivering produce to the beaches.

7    Q.    How long did you drive the truck for the

8    Gundrys?

9    A.    Okay.  Do you mean that year?  Because I've

10   been doing that every summer for several years.

11   Q.    So that's a temporary employment just during

12   the summer?

13   A.    Yeah.  Yeah.  It's like June to September.  I

14   guess I've been doing it for three, four years now.

15   Q.    Did you work anywhere else during the summer?

16   A.    No.

17   Q.    How many hours a week do you work for the

18   Gundrys when you drive a truck?

19   A.    Again, it kind of varies depending on how much

20   is sold.  30 hours a week probably.

21   Q.    What is your pay there?

22   A.    $8 an hour.

23   Q.    And what about prior to working for the Gundrys

24   this past summer, where did you work?

1      A.    Oh, God.  I can't remember.

2      Q.    Back in the spring you don't remember who you

3   worked for or where you worked?

4      A.    I know I delivered pizza for a week, but that

5   was -- beyond that, I really don't know.

6      Q.    When did you deliver pizza?

7      A.    You mean?

8      Q.    What time period?  Was that in 2006?

9      A.    2006, yeah.

10      Q.    2006.  You said you did that for about a week?

11      A.    Yeah.

12      Q.    Do you remember what pizza company you worked

13   for?

14      A.    Domino's.

15      Q.    And why did that last only a week?

16      A.    Well, that was just prior to me going to the

17   Gundrys and I couldn't be at both places at one time.

18   And the Gundrys a very fluid organization where you

19   kind of have to -- you know, the corn can only last so

20   long and Domino's wanted more of a regimen or, you

21   know, they needed a little more solid whatever you

22   want to call it.  So it just...

23      Q.    So more of regular-type hours at Domino's?

24      A.    Yeah.

13

1     Q.   You couldn't do that while you were working for

2   the Gundrys?

3     A.   Correct.

4     Q.   And do you recall anyplace that you have worked

5   prior to delivering pizza?

6     A.   I worked for FedEx over the Christmas holiday.

7     Q.   This past Christmas holiday?

8     A.   No.  2005-2006.

9     Q.   What did you do for FedEx?

10    A.   Just package handler in their plant in Seaford.

11    Q.   And that was just a temporary holiday

12   assignment?

13    A.   Yeah.  Exactly.  Basically, yes.

14    Q.   How many hours a week did you work there?

15    A.   30.

16    Q.   What was your pay?

17    A.   $8 an hour, I think.

18    Q.   When did you graduate from high school?

19    A.   1974.

20    Q.   Did you go to high school here in Delaware or

21   outside of Delaware?

22    A.   Pennsylvania.  Haverford, Pennsylvania, to be

23   exact.

24    Q.   Did you go to college after you graduated from

1  communications repair.

2      Q.    It was electronics repair?

3      A.    Yeah, something like that.

4      Q.    Do you recall how you did in those courses?

5      A.    The English course I did pretty good.  I had a

6  good teacher.  And, you know, the electronic course I

7  think I did fairly well.  I don't know whether, you

8  know...

9      Q.    Did you ever do any work in the electronics

10 repair industry?

11     A.    No, not really.

12     Q.    Any other college courses that you've taken?

13     A.    No.

14     Q.    Are you a member of any social organizations or

15 any types of clubs, anything like that?

16     A.    No.

17     Q.    When you filed the charge of discrimination

18 with the Delaware Department of Labor in November

19 2005, you alleged that --

20     A.    Well, I think it was the EEOC, Equal Employment

21 Opportunity Commission.

22     Q.    Did you actually go to Philadelphia to file

23 that?

24     A.    Yes.



1    Q.    You didn't file it in Milford?

2    A.    No.

3    Q.    You allege that you had a disability when you

4    filed that charge?

5    A.    Yeah.

6    Q.    What is your disability?

7    A.    I'm learning challenged, mentally challenged,

8    sometimes referred to as mentally challenged.  I

9    just -- my comprehension is not normal, whatever you

10    want to call it.

11    Q.    What major life activity would you say is

12    affected by this alleged disability?

13    A.    Well, it's like the best way to explain it is

14    supposedly everyone has a full deck, but I'm missing

15    something but I don't know what I'm missing so I

16    really can't tell you what I'm missing because I never

17    had it to begin with.

18          So it's like I wish I could answer that,

19    but there's just no way I can.

20    Q.    How does this alleged disability affect you?

21    A.    Again, I'm just taking what everyone has told

22    me and, you know, my IQ tests are like supposedly out

23    of this world, but when I get into -- like I told you

24    earlier, I can start class at 8:00 o'clock and be dead

1    A.    Yes.

2    Q.    And did you make a complaint about that?

3    A.    Yes.

4    Q.    Who did you complain to?

5    A.    My supervisor, whose name I think was Sean

6    Montgomery.

7    Q.    What did Mr. Montgomery do?

8    A.    He talked to the person that made the comments

9    and I thought that was the end of it.

10    Q.    How, if in any way, does your alleged

11    disability affect your ability to get along or

12    interact with others?

13    A.    I don't think there's ever really been a

14    problem of it.

15    Q.    Have you sought medical treatment for your

16    alleged disability?

17    A.    Yeah.  That's why I'm on ADD medications.

18    Q.    What doctor prescribed those medications?

19    A.    Dr. Padrel, P-a-d-r-e-l, I think it is.

20    Q.    What type of doctor is Dr. Padrel?

21    A.    She's the kind of doctor that -- there's two

22    different kind of shrinks and she's the kind that can

23    prescribe medications.  I get those two words

24    confused.

1    problem was or anything like that?

2        A.    No.

3        Q.    What about Dr. Padrel, has she given you a

4    diagnosis for whatever condition you may suffer?

5        A.    She might have.  You know, I'm assuming it's

6    just the ADD and the depression.

7        Q.    In the past have you treated with other mental

8    health professionals?

9        A.    No.  Because I really, you know, couldn't

10   afford it.

11       Q.    So the first time you treated with a mental

12   health professional was in, say, the 2004 time frame?

13       A.    Yeah.

14       Q.    Now, in the charge of discrimination that you

15   filed you indicated, and I'll quote, you indicated

16   that you, quote, make spontaneous statements due to

17   your disability.

18       A.    Mm-hmm.

19       Q.    What kind of spontaneous statements do you

20   make?

21       A.    Well, they're just spontaneous.  You know, it's

22   just spontaneous.  It's not really -- you know, I

23   don't, like I don't draw up a game plan as to what I'm

24   going to say or something.  I just say it.

26

1    been confronted by somebody as a result of making a

2    spontaneous statement?

3        A.    No.

4        Q.    Did you make spontaneous statements while you

5    were employed by FedEx?

6        A.    I could have.

7        Q.    But nothing that got you in trouble while you

8    were working at FedEx?

9        A.    No.

10       Q.    What about while you were delivering pizzas for

11   Domino's?

12       A.    No.

13       Q.    No problems with making spontaneous statements?

14       A.    No.

15       Q.    At any point today have you made a spontaneous

16   statement?

17       A.    Not that I'm aware of.

18       Q.    What about yesterday?

19       A.    No.

20       Q.    During class do you make spontaneous

21   statements?

22       A.    I could.  I don't know.

23       Q.    What do you mean you could?

24       A.    Well, you know, if I don't understand



27

1   something, I'll just say, "Hey, wait a minute.  You

2   know, what's going on here?"

3       Q.   So that's the type of spontaneous statement to

4   which you're referring?

5       A.   Yeah.

6       Q.   If you don't understand something, you'll let

7   the person know?

8       A.   Yeah.

9       Q.   What about while employed at Del Tech in the

10  computer lab, can you think of any occasion when you

11  have made a spontaneous statement there?

12      A.   No.

13      Q.   What about at the package store?

14      A.   No.

15      Q.   You haven't been spoken to at any of these jobs

16  regarding spontaneous statements?

17      A.   No.

18      Q.   Have you spoken to Dr. Padrel about how these

19  spontaneous statements might be connected to your

20  alleged disability?

21      A.   Yeah.  But she doesn't really have a specific

22  answer.

23      Q.   Did you speak to the therapist in Rehoboth

24  about that?

1      A.    No.   I don't think so.

2      Q.    What about Dr. Kafa, did you speak to him about

3  that?

4      A.    Yeah.   I think I did at one point but, again,

5  it was like there was no resolution or anything about

6  it.

7      Q.    So nobody has connected the spontaneous

8  statements to the learning disability that you suffer

9  from or the other disabilities from which you allege

10  you suffer?

11      A.    I don't know.   I can't answer that.

12      Q.    Has anybody told you that they're connected?

13      A.    No.

14      Q.    Have you ever been terminated from a job as a

15  result of your inability to control what you say?

16      A.    Yeah.   Seaford School District.

17      Q.    From any other job?

18      A.    I can't think of any.

19      Q.    When were you originally hired by the Gundrys?

20      A.    It was like August I'm thinking 2003.   Yeah, I

21  think it was 2003.

22      Q.    And what made you apply for a job with the

23  Gundrys?

24      A.    They had a thing posted at their market saying

33

1    Q.    When you were originally hired by the Gundrys

2    did you tell them that you had an alleged disability?

3    A.    No.

4    Q.    Did you tell them that you had a tendency to

5    make spontaneous statements?

6    A.    No.

7    Q.    Did you ever advise Seaford that you had a

8    tendency to make spontaneous statements?

9    A.    Well, they already knew about it.

10   Q.    How did Seaford already know about it?

11   A.    Back in 1964 they sent me to a psychologist in

12   Georgetown to investigate this.

13   Q.    Okay.  So you think that Seaford still has

14   knowledge from what happened in 1964?

15   A.    Well, I don't know.  You know, I just have

16   paperwork that says that they instigated this

17   investigation of me.

18   Q.    Do you know what the conclusions were from that

19   investigation?

20   A.    Oh, God.  I sent it to you.

21   Q.    No, without looking at documents.  If you know.

22   A.    They had me on -- oh, God.  What was the name

23   of that drug?

24            God.  Dexadrin or something like that.

1    And they wanted me to -- there was a lot -- I had

2    several pages of communications.  Basically, at that

3    point my parents chose not to use the public

4    facilities in Georgetown.  Instead, they had me taken

5    to Wilmington for a more professional diagnosis.

6        Q.    In 1964 how old were you?

7        A.    Let's see.  In 1964 I would have been 8.

8        Q.    In 2003 did you advise Seaford that you had a

9    tendency to make spontaneous statements?

10       A.    Well, they already knew about it.

11       Q.    That's not my question.

12              In 2003 --

13       A.    No.

14       Q.    -- did you advise Seaford that you had a

15    tendency to make spontaneous statements?

16       A.    No.

17       Q.    Did you advise Seaford that you believed you

18    suffered from a disability in 2003?

19       A.    No.

20       Q.    In your complaint you have alleged that two

21    incidents led to your termination.

22       A.    Mm-hmm.

23       Q.    And you described the first incident as

24    offering condoms to students in paragraph 8 of your

1    14, 15, 16, something like that.  I couldn't tell you.

2        Q.    What were the girls saying?

3        A.    Well, you know, I said that, as I said in here,

4    they were talking about, you know, various different,

5    you know, sexual, you know, things.

6              To be honest with you, at this point in

7    time I can't remember what the actual conversations

8    were.

9        Q.    So they were talking about some type of sexual

10   things in a conversation?

11       A.    Yeah.

12       Q.    Were they talking to you about these things?

13       A.    Well, the one about the douche, yes, they did

14   ask me specifically what it was.

15       Q.    Did you answer their question?

16       A.    Yes.

17       Q.    And then what happened?

18       A.    I let it go.

19       Q.    What do you mean you let it go?

20       A.    Well, that was the end of it.  I told her what

21   it was and that was it.

22       Q.    At some point did you stop the bus?

23       A.    No.  I think the bus was stopped.  I think if

24   I'm not mistaken, it was in the -- I was waiting to

1    unload the students.  You know, she asked me what a

2    douche was and I told her.

3        Q.    And at what point did you offer them condoms?

4        A.    That was at a later time.  They were having

5    progressively more -- what do you call it? -- explicit

6    conversations and they were not, you know, quiet about

7    it.  They were very like they wanted people to hear.

8        Q.    At a later time on the same day?

9        A.    I can't remember.  I don't think so.

10       Q.    You think there was one conversation where they

11   asked you what a douche was?

12       A.    Yeah.

13       Q.    You explained what that was?

14       A.    Yeah.

15       Q.    And then at what point did you offer them

16   condoms?

17       A.    Well, again --

18       Q.    I mean, was it a day later?  Was it two days

19   later?

20       A.    Probably a week or two later.

21       Q.    A week or two later.  What prompted that?

22       A.    Again, these explicit conversations and they

23   were like -- you know, so...

24       Q.    Other than asking what a douche was, were any

1    of these conversations directed to you?

2    A.    I don't know.  I can't remember.  I don't think

3    so.

4    Q.    So after that incident when they asked you what

5    the item was, you said maybe a week or two later they

6    were having another conversation?

7    A.    Oh, they were having regular conversations

8    daily about this stuff.  And it finally got to the

9    point I said hey, listen, you know, if they're not

10   doing anything, you know, it's like, you know,

11   they're...

12   Q.    If they're not doing anything?  Who is "they"?

13   A.    No.  If they were, you know -- these were

14   pretty explicit conversations they were having.  They

15   were not being quiet about it.  And so I basically

16   just said, "Listen, do you need condoms?"  And I left

17   it at that.  I didn't ask for an answer.  I just

18   said...

19            Then it all came back and we had this

20   meeting and I was told from that point on to refer all

21   of this to the wellness center at the school.

22   Q.    When you offered the girls condoms, were they

23   alone with you on the bus?

24   A.    Yes.

```
 1       Q.    Had you taken a different route that day?

 2       A.    No.

 3       Q.    Did you deviate from your route?

 4       A.    No.

 5       Q.    Did you let --

 6       A.    We're not allowed to deviate from our routes

 7   unless specifically told by the school district.

 8       Q.    Did you let one of their brothers off of the

 9   bus?

10       A.    Yes.

11       Q.    Did you let him off at his normal stop?

12       A.    Yes.

13       Q.    Should the girls have gotten off at that stop?

14       A.    One of them would have, yes.

15       Q.    But she did not get off?

16       A.    Yeah.  She did eventually, yes.

17       Q.    So you let the brother off and then these two

18   girls remained on the bus with you?

19       A.    Mm-hmm.

20       Q.    14- or 15-year-old girls?

21       A.    Mm-hmm.

22       Q.    And you were how old at the time?  Maybe 49, 50

23   years old?

24       A.    Yeah.
```



42

1       Q.    And with two young, teenage girls alone on the

2    bus with you, you offered them condoms?

3       A.    Yeah.

4       Q.    What was their reaction?

5       A.    They declined.

6       Q.    Did they exit the bus at that point?

7       A.    Yeah.  One of them did.  That was her stop.

8       Q.    And the other one remained on the bus?

9       A.    Until I got to her stop and she exited.

10      Q.    Were there other students on the bus at that

11   time --

12      A.    No.

13      Q.    -- or was it just those two girls?

14      A.    No.  Just those two girls.

15      Q.    When you offered them condoms, is that an

16   example of a spontaneous statement that you make?

17      A.    Yeah.

18      Q.    But you heard them talking fairly explicitly

19   for two weeks --

20      A.    Mm-hmm.

21      Q.    -- and didn't make this spontaneous statement?

22      A.    Well, I was hoping it would go away but it was,

23   you know, like they were not being -- that's the same

24   thing with the douche.  I was like drop it.

1    A.    No.

2    Q.    Did they ask you for condoms?

3    A.    No.

4    Q.    After the conversation in which you offered

5    them condoms, did you tell anyone at the school

6    district about that?

7    A.    No.    They came back to me like the next day or

8    something and --

9    Q.    Who is "they"?

10    A.    Mr. Gundry.

11    Q.    So the owner of the bus company came to you?

12    A.    Yes.

13    Q.    What did Mr. Gundry say?

14    A.    He asked me.    I told him yes.    And then

15    eventually I guess about six weeks later we had a

16    meeting with the parents.    And that was when they said

17    I was supposed to not to have any further, you know,

18    refer it to the office or the wellness center.

19    Q.    How did Mr. Gundry find out about the

20    conversation?

21    A.    I'm assuming from Mr. Satterelli or...

22    Q.    Did you tell Mr. Satterelli about the

23    conversation?

24    A.    Not initially, no.



45

1    Q.    Do you know who told Mr. Satterelli about the

2    conversation?

3    A.    I'm assuming the parents.

4    Q.    So were the parents on the bus with you when

5    you had the conversation with the girls?

6    A.    No.

7    Q.    So presumably the girls told their parents?

8    A.    I couldn't answer that.  I don't know.

9    Q.    You had a meeting with the girls' parents?

10   A.    One of the girls' parents, yes.

11   Q.    Were they upset?

12   A.    Yeah.

13   Q.    And the school district sat down and talked to

14   you about how to handle a situation like this in the

15   future, correct?

16   A.    Yeah.  Yeah.

17   Q.    And how to appropriately deal with teenage

18   students on the bus?

19   A.    Yeah.

20   Q.    And so after your conversation with

21   Mr. Satterelli you understood that it was

22   inappropriate to offer condoms to teenage girls on

23   your bus route, correct?

24   A.    Yeah.  Oh, yeah.  It was -- yeah.

1    Q.    Did you understand that it was inappropriate to

2    have a conversation like that with the students on

3    your bus route?

4    A.    Now I do, yeah.

5    Q.    Now, following this incident you indicated

6    there was a second incident?

7    A.    Mm-hmm.

8    Q.    You described that as text messaging the

9    student?

10   A.    Yeah.

11   Q.    And that's you text messaged a student?

12   A.    Yes.

13   Q.    What age was the student?

14   A.    Oh, God.  14, 15.  I couldn't -- you know,

15   offhand I couldn't tell you.  See, that's the thing.

16   We don't know.  A student's age is never, you know,

17   defined.  You know, we can guess by the year that they

18   are in school, but their date of birth is not provided

19   to us.

20   Q.    You understand that the majority of the

21   students are going to be under the age of 18?

22   A.    Oh, yeah.  Yeah.

23   Q.    If not probably under the age of 16?

24   A.    Maybe, yeah.  Yeah.

1    Q.    Do you recall, was the student in high school

2    or middle school?

3    A.    I think middle school.

4    Q.    Why did you want to text message her?

5    A.    Well, I didn't know how to do any text

6    messaging and I was just trying to find somebody that

7    I never had a text conversation, you know, with so

8    that I could understand how to, you know, do it in the

9    future.

10    Q.    How did you get -- it was a female student,

11    correct?

12    A.    Yeah.

13    Q.    How did you get her cell phone number?

14    A.    Well, I gave her mine in case she was going to

15    be late or anything for the morning to call me and I

16    would wait for the bus and she did call me and that's

17    how I got her phone number.

18    Q.    Did you give all of the students your cell

19    phone number?

20    A.    Any that wanted it.

21    Q.    Did she ask you for your cell phone number?

22    A.    To be honest, I can't remember whether I asked

23    her or whether she asked for it.  You know, I do

24    remember that there was a couple of times that she was

1   not like a continuation of a previous thread or

2   anything like that.  It was cold.  It was, you know,

3   just that.

4       Q.   What do you mean it wasn't a continuation of a

5   previous thread?

6       A.   It wasn't something like that had started

7   previously where I would just be working off of a

8   previous conversation.  There would just be, you know,

9   no...

10      Q.   So text messaging her would be new?

11      A.   Yes.

12      Q.   Is that what you're saying?

13      A.   Yeah.  There would be no, no thread or whatever

14  you want to call it.

15      Q.   I guess I don't understand.  You chose to text

16  message her because you had not text messaged with her

17  before?

18      A.   Well, it wasn't her specifically.  It was just

19  somebody that I had never had a thread with.  I was

20  trying to learn how to text.  She was just a random

21  individual.

22      Q.   Had you text messaged with other people before?

23      A.   Oh, yeah.  But it had always been a thread that

24  I was working off of, somebody, you know, that they

53

1    Q.    Did he ask you if that was your cell phone?

2    A.    Yeah.

3    Q.    Did he ask if you had used it to text message?

4    A.    I don't think we got to that point.  I think he

5  just was saying something about "We're doing an

6  investigation and this number had come up" and, you

7  know, that was the extent of it.

8    Q.    You initially denied to Mr. Satterelli that

9  that was your cell phone, correct?

10    A.    Yeah.

11    Q.    Why did you deny that that was your cell phone?

12    A.    I just didn't understand what was going on.

13    Q.    Well, you understood that he asked if that was

14  your cell phone?

15    A.    Yes.

16    Q.    And you said, "No, it's not my cell phone"?

17    A.    As I said, I just didn't understand what was

18  going on.

19    Q.    But, again, you understood his question was is

20  that your cell phone?

21    A.    Yes.

22    Q.    And your response was "No, it's not" even

23  though it was your cell phone, correct?

24    A.    Yes.

1    you had a meeting with Mr. Satterelli, correct?

2      A.    Well, sort of.    After that I left school and

3    went over to the school district office and he said I

4    was terminated.

5      Q.    Did he explain to you why you were terminated?

6      A.    Because of this text messaging.

7      Q.    Did you tell him you didn't think that that was

8    inappropriate to text message a student?

9      A.    I was too confused to say really anything.    It

10   really wasn't until four, five days later that it

11   started to sink in what had occurred.

12     Q.    Did you understand that you were terminated

13   because you had behaved inappropriately with students

14   on your bus route?

15     A.    Yeah.

16             I'm new to all of this.    How long is this?

17   Not that I have to go anywhere, but I would just like

18   to know.

19     Q.    They can last for up to seven hours per the

20   Federal Rules.    This one will not last seven hours.

21     A.    Okay.

22     Q.    But do you understand -- and I actually wanted

23   to note this on the record initially and I forgot to

24   do so.    I apologize.

1    have complained about your spontaneous statements?

2      A.    Yeah.   Probably.   Sometimes I might, something

3    might fly out.   Like -- I can't really give you an

4    instance.   But somebody would say something and I'll

5    like, you know, my response is just so, you know, you

6    can be like -- it's a correct response, but when you

7    think about it and have different...

8      Q.    Different interpretations?

9      A.    Yeah.   Yeah.   Thank you.

10     Q.    Can you think of anything in particular?

11     A.    No.   Just that, you know, quite often people

12   like -- oh, okay.   Yeah.   I can give you one.   Now,

13   this is like because it's...

14               Quite often, especially to people I really

15   don't know, they'll say, "How are you doing?"   And

16   I'll say, "Well, I'm still breathing, but just tell me

17   if I stop."   It's like these people say, "Well, I

18   think you'll be the first to know."   And it's like,

19   you know, spontaneous and it was like -- you know.

20     Q.    So that's an example of --

21     A.    Spontaneity.

22     Q.    Do you contend that the incidents that we

23   discussed that occurred during the time that you were

24   a school bus driver at Seaford, do you contend that

1    contractors would also be, if it was just a

2    suspension, would be eligible to hire me.  So, again,

3    whether there's anything there or not or whatever or

4    not, if there was something else in the pot going on

5    that they might be able to get a driver.

6        Q.    Are these other contractors who contract with

7    Seaford School District for bus drivers?

8        A.    One -- most of them were Seaford.  Some were

9    with Cape Henlopen was one.  Milford School District

10   was one.  And -- is Dover Capitol?  Yes, Capitol.

11           They have all said that there's something

12   over the top here but, again, it's like in some

13   respects it's difficult to find qualified bus drivers

14   and I would not be surprised if they're not looking

15   out for their backside to get another driver, so let

16   me just qualify that.

17           Do you understand what I'm saying?

18       Q.    Okay.  If we assume that your inappropriate

19   behavior with the children on the bus at Seaford

20   School District just for purposes of this question is

21   the result of your alleged disability, is there any

22   accommodation that could have been implemented by

23   Seaford or by the Gundrys to protect the children from

24   your behavior?

1    A.    I don't know.

2    Q.    Can you think of anything at all that Seaford

3  could have done?

4    A.    Well, no.

5    Q.    Did you ever ask or make Seaford aware of your

6  need possibly for an accommodation?

7    A.    No.   Because I was under the assumption that

8  they were already aware of the situation.

9    Q.    Aware of what situation?

10   A.    Of my disability since they had instigated, you

11 know, previously investigations into it.

12   Q.    Forty years before that, correct?

13   A.    Yeah.

14   Q.    Did you ever make the Gundrys aware of your

15 belief that you may need an accommodation?

16   A.    No.

17   Q.    Why not?

18   A.    I didn't really think about it.

19          MS. BECNEL-GUZZO:   I'm going to hand you a

20 document that we will mark as Dismore Exhibit No. 2.

21          (Dismore Deposition Exhibit No. 2 was

22 marked for identification.)

23 BY MS. BECNEL-GUZZO:

24   Q.    We have handed you a document that's been



1    examination, you represented to --

2       A.    Yeah.    Because I don't think of this as being a

3    psychiatric disorder.    It's just I'm mentally

4    challenged.    It's like -- you know, it's not like I'm,

5    you know, a chainsaw murderer or something like that

6    or a suicidal maniac or anything like that.

7            It just says psychiatric disorder.    I

8    don't really think of it as anything other than I'm

9    mentally challenged.

10           MS. BECNEL-GUZZO:    Let's mark this as

11   Dismore Deposition Exhibit No. 3.

12           (Dismore Deposition Exhibit No. 3 was

13   marked for identification.)

14   BY MS. BECNEL-GUZZO:

15      Q.    Mr. Dismore, I've handed you a document that's

16   been marked as Dismore Deposition Exhibit No. 3.

17      A.    Mm-hmm.

18      Q.    Do you recognize this document?

19      A.    Yeah.

20      Q.    And in the middle of the page there's a

21   certification that says, "I certify that the above

22   information is complete and true."

23      A.    Mm-hmm.

24      Q.    And it goes on to say to make another sentence,

1    but below that is your signature.  Is that correct?

2       A.    Yeah.

3       Q.    And the date is September 9, 2004?

4       A.    Mm-hmm.

5       Q.    And section number 2, Health History, if you

6    look in the second column, the middle column down, it

7    says nervous or psychiatric disorders, for example,

8    severe depression.

9               You checked no, correct?

10      A.    Yeah.  And I checked medication, Assttara.

11      Q.    What medication is that?

12      A.    That's ADD medication.

13      Q.    Strattera is ADD medication?

14      A.    Yes.  That's what I told you earlier.

15      Q.    Because that's actually I think a different

16   medication than you said earlier.

17      A.    No.  It's A-s-s-t-t-a-r-a.

18      Q.    Well, there's no A at the start of this.

19      A.    Oh, okay.

20      Q.    But you believed you were filling in an ADD

21   medication in that spot?

22      A.    Yeah.

23      Q.    Is there any reason you marked no for whether

24   you suffered from a nervous or psychiatric disorder?

1    A.    Probably I was in a rush.  I was probably in a

2    rush of some sort or just was not really reading it,

3    but I did mark, yeah, that is my handwriting for

4    Assttara, so...

5    Q.    And at that time, September '04, were you also

6    taking medication for depression?

7    A.    I couldn't tell you that.

8    Q.    You indicated that you thought that text

9    messaging the student was not inappropriate?

10   A.    No.

11   Q.    But you understood that Seaford terminated your

12   employment or the Gundrys and Seaford terminated your

13   employment because of your inappropriate behavior with

14   the children on the bus?

15   A.    Eventually, yes.

16   Q.    Do you still have a problem understanding

17   appropriate behavior with children?

18   A.    Yeah.

19   Q.    How can Seaford be sure that no other problems

20   would occur if you remained as a school bus driver?

21   A.    I don't know.

22   Q.    In the complaint that you filed in Superior

23   Court, which was then transferred to District Court,

24   moved to District Court, you alleged that retaliatory

1    threats were made against you through third parties.

2    A.    Mm-hmm.

3    Q.    What do you mean by that?

4    A.    (Pause).

5    Q.    Actually, let's break it down.

6            What retaliatory threats were made to you?

7    A.    Basically, over Christmas 2005 another

8    contractor called me asking me whether I might be, you

9    know, interested in working for him and I had a nice

10   conversation with him.  And after that I called the

11   Gundrys and then the Gundrys, in turn, called

12   Mr. Satterelli and he told them he threatened to

13   remove me by force if he ever saw me driving any

14   school bus for the Seaford School District.

15   Q.    So this was after you were terminated by the

16   Gundrys --

17   A.    Mm-hmm.

18   Q.    -- and no longer driving a bus?

19   A.    Mm-hmm.

20   Q.    Another contractor talked to Mr. Satterelli

21   about having you back as a bus driver?

22   A.    No.  He talked to me.  And then when I got done

23   with him, I called the Gundrys and said, "Listen,

24   what's going on here?  Can I come to work for you?"

1                And they said, "Well, I'll call

2    Mr. Satterelli."  And then they called me back and

3    said that Mr. Satterelli had said that if he had ever

4    saw me driving a school bus he would, you know,

5    physically remove me by force if necessary.

6        Q.    But that was after you were already

7    terminated --

8        A.    Yes.

9        Q.    -- and Seaford indicated that they did not want

10   you to drive a school bus in its district, correct?

11       A.    For that answer, yes, correct.

12       Q.    Was there another answer?

13       A.    Well, my appeal through the EEOC was started in

14   November and it ended in March of 2006, so this was,

15   in fact, during the appeal process.  And from what the

16   EEOC has told me that is considered, you know, threats

17   are a crime; you cannot interfere with an

18   investigation.

19       Q.    Did Mr. Satterelli interfere with the EEOC's

20   investigation?

21       A.    Well, he threatened to remove me from a school

22   bus.  So that was -- it just says in there, they list

23   several different things:  You cannot threaten,

24   coerce.  There's like several different things that if

1    don't know.

2       Q.    Do you have notes relating to this harassment?

3       A.    I don't think so.  I think, I think it's just

4    verbal, you know, like harassment.

5       Q.    Do you recall when this harassment took place?

6       A.    Not offhand.

7       Q.    Do you recall who harassed you?

8       A.    No.

9       Q.    Did you report the alleged harassment to

10   anyone?

11      A.    No.  Well, no.

12      Q.    Did the harassment or the alleged harassment

13   take place by somebody within the Seaford School

14   District?

15      A.    Again, I would really have to, you know, go

16   through my notes and try to remember, you know, what

17   this was all about.

18      Q.    What notes do you have that would relate to

19   this harassment?

20      A.    I don't really know.  I just -- well, do you

21   have my original thing that I gave to the court?

22      Q.    I'm not sure to what you're referring.

23      A.    You know, when I had to do the, I had to make a

24   list of reasons or whatever and I think it was on that

1    A.    No.   I think it was at Mr. Carter's insistence.

2    Q.    And how did you meet Mr. Carter?

3    A.    Again, I don't remember how I got a hold of

4    him.  I think, you know, his office is right there

5    with unemployment in Georgetown, so I'm assuming that

6    it was another avenue to approach to find work.

7    Q.    Did the unemployment office refer you to

8    Mr. Carter?

9    A.    I can't answer that.  You know, I know it's

10   like, it's like, it's a two-story building and when

11   you go up one side of the building it's unemployment

12   and you go up the other side and that's where he is.

13   Q.    Did Mr. Carter help you find suitable

14   employment?

15   A.    He was the motivator, I guess you would call

16   it, to return to college.  He felt that under the ADA,

17   Americans with Disabilities Act, the college might be

18   in a position for me to, you know, succeed with.

19   Q.    In your courses that you take at Del Tech do

20   you receive accommodations from Del Tech?

21   A.    Well, yeah, I guess you would call them

22   accommodations or tutors.  I take some of my tests in

23   different formats than regular students take.  You

24   know, I have extended time for taking tests.  Every

# EXHIBIT C

# SEAFORD MIDDLE SCHOOL

DATE:  September 30, 2005

STUDENT(S):
RE: TEXT MESSAGE/CELL PHONE

*Exhibit A*

The above student came to me after speaking with our guidance department about the situation.          told me that the previous day she received several text messages from her bus driver.
There were a total of four messages from 344-5738 that came to          on September 29.  The first message came at 1:59 pm, when          was in class.  The second came at 2:08, the next was at 2:22 and the last came at 2:30.          told me that her bus driver had asked for her cell phone number in case he needed to let her know something was wrong or to get in touch with her parents.

I have statements from          and another student          I have a photo copy of          cell phone and I have a written description of the messages that were exchanged.  I also had Det. Albert speak with          about this situation.


Kimberly Simmons
Associate Principal

S038

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: Not Reported in F.Supp.2d)

**H**

Morgan v. Secretary of Health, Human Services
D.Del.,2002.

United States District Court, D. Delaware.
Antoinette MORGAN, Plaintiff,
v.
SECRETARY OF HEALTH AND HUMAN
SERVICES, Defendant.
**No. CIV.A.01-244-MPT.**

Feb. 13, 2002.

Stephen A. Hampton, Esquire, Grady & Hampton,
P.A., Dover, for plaintiff.
Colm F. Connolly, Esquire, United States Attorney,
Virginia Gibson-Mason, Esquire, Assistant United
States Attorney, United States Attorney's Office,
Wilmington, for defendant.

OPINION

THYNGE, Magistrate J.

I. Introduction

*1 The plaintiff, Antoinette Morgan, brought this
claim against the Government pursuant to 42 U.S.C.
§ § 405, 416 and 1381. Having exhausted her
administrative remedies, she seeks review of the
administrative law judge's denial of disability
benefits, period of disability, and supplemental
security income. Presently before the court are the
parties' cross-motions for summary judgment. For the
reasons stated below, the plaintiff's motion is
DENIED and the defendant's motion is GRANTED.

II. Background

a. Social Security System

Under the Social Security Act, 42 U.S.C. § 423 [FN1],
eligible persons may apply to the Social Security
Commissioner ("Commissioner") to receive
disability benefits. Eligible persons are those who are
"insured for disability insurance benefits...[have] not
attained retirement age...[have] filed an application
for disability insurance benefits, and [are] under a
disability." 42 U.S.C. § 423(a)(1). In order to receive

the benefits, a claimant must show that she is
disabled under § 423(d)(1). That section defines
disability as the "inability to engage in any
substantial gainful activity by reason of any
medically determinable physical or mental
impairment which can be expected to result in death
or which has lasted or can be expected to last for a
continuous period of not less than 12 months." 42
U.S.C. § 423(d)(1)(A).

> FN1. The plaintiff filed for disability
> benefits ("DIB") under § 423, a period of
> disability under § 416, and social security
> benefits ("SSI") under § 1381. Since these
> statutes are similar, and define disability in
> the same manner, the court will refer to the
> statutory sections governing disability
> benefits only. See Matthews v. Apfel, 239
> F.3d 589, 590 (3d Cir.2001); Borrero v.
> Callahan, 2 F.Supp.2d 235, 241
> (D.Conn.1998).

The Social Security regulations require that the
Commissioner or an administrative law judge
("ALJ") follow a five-step process when a person
requests Social Security benefits. See 20 C.F.R. §
404.1520. In Plummer v. Apfel, 186 F.3d 422, 428-29
(3d Cir.1999), the Third Circuit explained the process
mandated by the regulations. First, the Commissioner
must evaluate whether a claimant is participating in
"substantial gainful activity." Plummer at 428. If so,
the Commissioner should deny disability benefits. Id.
If a claimant is unable to participate in substantial
gainful activity, the Commissioner should determine
if a severe impairment is the basis. Id. If a claimant
suffers from a severe impairment, a comparison of
the claimant's medical evidence "to a list of
impairments presumed severe enough to preclude any
gainful work," is then required. Id. (citing 20 C.F.R.
§ 404.1520(d) ). If a claimant suffers from one of the
listed impairments, or its equivalent, the
Commissioner should grant disability benefits. Id.
However, should the claimant not suffer from a listed
impairment, the process continues. Id.

In step four, an ALJ must determine "whether the
claimant retains the residual functional capacity to
perform her past relevant work." Id. (citing 20 C.F.R.
§ 404.1520(d) ). If the ability to return to prior
employment exists, the Commissioner should deny

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167

(Cite as: Not Reported in F.Supp.2d)

disability benefits. *Id.*

The burden of proof in each of the previous steps remains with the claimant. *Id.* (citing 20 C.F.R. § 404.1520(f) ). However, the burden shifts to the Commissioner in the final step of the process. *Id.* (citing 20 C.F.R. § 404.1520(f) ). In this step, the Commissioner must show that a claimant is capable of performing other work, and upon such a showing, an ALJ should uphold the decision to deny disability benefits. *Id.*

**\*2** A claimant who disagrees with any decision of the Commissioner may request reconsideration of that decision. 42 U.S.C. § 405(g). Additionally, a claimant may request an administrative hearing in front of an ALJ. *Id.* If the request is granted, and the ALJ renders an unfavorable opinion, a claimant may appeal to the Social Security Appeals Counsel. *Id.* If a claimant is dissatisfied with the decision of the Appeals Counsel, an appeal to the District Court in the jurisdiction where the claimant resides or is primarily employed is available. Id.

### b. Plaintiff's Background

The plaintiff in this matter injured her right wrist in late 1991 while working. *D.I. 10 at 196.* She experienced continuous pain in her right wrist and was treated by a number of physicians in 1992. *D.I. 15 at 2.* In September of that year, she underwent a carpal tunnel release, which provided a temporary relief in the discomfort. *Id. at 3.* However, the discomfort in her wrist returned in late November 1992. *Id.* In an attempt to relieve the pain, plaintiff underwent another procedure, a "right lunotriquetral arthrodesis with iliac crest bone graft on [her] wrist." *Id.* The procedure involved a bone graft from plaintiff's hip, which according to plaintiff has caused chronic pain in her hip. *Id. at 16, 27.*

Morgan's pain in her wrist and hip became chronic. She underwent physical therapy, and at times wore a brace to relieve the pain. *Id. at 4.* Then, in a 1994 automobile accident Morgan sustained injuries to her head, neck and back. *Id. at 9.* According to plaintiff, these injuries caused additional chronic ailments including constant headaches, muscle spasms, and neck pain. *Id.*

Finally, Morgan was raped by an acquaintance in 1997, which caused mental problems including anxiety and post traumatic stress. *Id. at 16, 17.* She claims that these conditions have caused her to cry

extensively, become easily agitated, and avoid going out in public. *Id. at 17.*

Morgan asserts that her physical injuries have caused constant pain in her joints, and left her unable to walk more than a block, sit for more than fifteen minutes, and stand for any extended period of time.

### c. Procedural History

Plaintiff first filed for disability benefits on December 7, 1994, alleging physical and mental disabilities. *See D.I. 10 at 11.* After the Commissioner initially denied her claim and on reconsideration, Morgan requested a hearing before an ALJ which was held on October 15, 1996. *Id.* The ALJ denied Morgan's application for benefits, finding that she was capable of performing her past relevant work. *Id.* Morgan appealed the decision to the Appeals Counsel, which vacated the decision and remanded the case because the record was incomplete. [FN2] On March 11, 1998, a new ALJ held a second hearing. [FN3] *Id.* As a result of the hearing, the ALJ denied Morgan's requests for period of disability, disability benefits, and supplemental security income. *Id.* Morgan appealed the decision to the Appeals Counsel, who declined to review the case. Her action with this court was initiated on April 12, 2001. *Id.*

> FN2. The record was incomplete because the recording device at the hearing malfunctioned. Thus there was no full record of the testimony at that hearing.

> FN3. *Id. at 12.* A supplemental hearing in which the ALJ heard additional vocational testimony was held on July 21, 1998. For the purposes of this decision, the hearing and the supplemental hearing are the same.

### d. The ALJ's Decision

**\*3** In his decision, the ALJ explained the prior history of plaintiff's application for benefits, and incorporated the ALJ's findings from the first hearing. *D.I. at 11, 12.*

The ALJ held that Morgan had a severe impairment, but that "the evidence [did] not demonstrate that the claimant's impairments, considered either singly or in combination, are of a severity to meet or equal any of the impairments listed on the Listing of

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
**(Cite as: Not Reported in F.Supp.2d)**

Impairments." *Id. at 13*. The ALJ also found that Morgan's testimony as to the severity of pain was not credible and not supported by any medical records. *Id. at 17*. In support of this finding, the ALJ discussed Morgan's extensive daily activities, which included washing dishes, doing laundry, shopping, cleaning, cooking, getting the children ready for school, caring for an infant, reading, and watching television. *Id. at 18*. Further, the ALJ noted that Morgan's testimony was inconsistent at times. *Id*. For example, Morgan stated that she sat with her grandmother in order to keep her company, but also claimed that she was unable to sit for more than fifteen minutes. [FN4] The ALJ also noted that a number of medical records indicated that Morgan had full range of movement. *Id. at 13, 14*. For example, in a 1996 medical examination, Dr. Fred Kahn concluded that Morgan's right wrist "impairment was permanent but stable." *Id. at 14*. Dr. Kahn also found that plaintiff had "no other disabling conditions or limitations." *Id*. Also, in 1998, Dr. Donald Morgan [FN5] examined plaintiff's hip concluding that "she had full ROM, with pain on full waist flexion and extreme right-side bending... good right-hand strength and full motor strength in all other extremities ." *Id*. Further, the ALJ noted that the "[m]edical records failed to reflect the presence of any atrophy typical in cases of inactivity due to pain."

> FN4. The ALJ also noted that Morgan's contentions regarding her inability to do any housework were contradicted by the testimony of one of her house-mates, who stated that she had witnessed Morgan perform light housework. *Id*.

> FN5. Dr. Morgan (no relation) examined the plaintiff at the request of the Social Security Administration.

With regard to her mental limitations, the ALJ found that despite her claims to the contrary, Morgan is able to get along with others, and socialize with her friends. *Id. at 18*. In reaching this conclusion, the ALJ relied on the opinion of Dr. Reynolds, a psychiatrist who examined the plaintiff.[FN6] Dr. Reynolds found that "[Morgan] has a good ability to follow work rules and function independently...a fair ability to interact with supervisors and co-workers; use judgment; understand, remember, and carry out simple and detailed job instructions...[and]...her ability to deal with the public, and behave in an emotionally stable manner...is poor." *Id. at 15*.

> FN6. The Social Security Administration requested this examination.

Moreover, the ALJ stressed Morgan's failure to seek medical assistance, or counseling for the mental and medical problems she alleged. *Id. at 18*.

For the above reasons, the ALJ held: "[w]hen considered in combination, all of these factors... [indicate]...that the claimant does not suffer pain of a disabling intensity." *Id*.

After finding that Morgan's medical conditions did not equal the listed impairments, the ALJ addressed plaintiff's ability to work. *Id*. Based on the vocational testimony at the hearing, the ALJ found that Morgan could "perform 25 percent of the sedentary occupational base." *Id. at 19*. Because there were opportunities in the national economy at that time, the ALJ found that Morgan was not disabled. *Id*.

### II. Legal Standards

#### a. Summary Judgment Standard

**\*4** Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should not be granted if the dispute involves a material fact. [FN7] "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson, 477 U.S. at 247-48*. There is a genuine issue of fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248* (citations omitted). Additionally, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an [essential element]...on which that party will bear the burden of proof at trial...since a complete failure of proof concerning an essential element of [that]...party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23; 91 L.Ed.2d 265; 106 S.Ct. 2548 (1986)*.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: Not Reported in F.Supp.2d)

FN7. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson et. al. v. Liberty Lobby, Inc., et. al., 477 U.S. 242, 248; 91 L.Ed.2d 202; 106 S.Ct. 2505 (1986).*

The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Id. at 323.* A moving party can meet its burden if the party "point[s] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id. at 325.* On the other hand, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but...must set forth specific facts showing that there is a genuine issue for trial.' '*Id. at 321* (citing *Catrett v. Johns-Manville Sales Corp., 756 F.2d 181, 184 (1985)* ).

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party drawing all reasonable inferences in that party's favor. *Anderson, 477 U.S. at 255.* The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id. at 251.* In deciding a motion the court should apply the evidentiary standard of the underlying cause of action. *Id. at 251-52.*
In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.

**\*5** *Id. at 251.*

### b. Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. *42 U.S.C. § 405(g)* provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party...may obtain review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Counsel affirms an ALJ decision, denies

review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. *Aversa v. Secretary of Health & Human Services, 672 F.Supp. 775, 777 (D.N.J.1987); see also 20 C.F.R. § 404.905.*

This court has jurisdiction to review the case under *§ 405(g)* because the Commissioner's decision became final when the Appeals Counsel declined to review the ALJ's denial of benefits.

### c. Standard Applicable to ALJ's Decision

A district court's review of an ALJ's decision is limited to whether the decision was supported by substantial evidence. *Jesurum v. Sec'y of the United States Department of Health & Human Servs., 48 F.3d 114, 117 (3d Cir.1995)* (citing *Brown v. Bowen, 845 F.2d 1211 (3d Cir.1988)* ). If the decision is so supported, the court is bound by those factual findings. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [FN8] Substantial evidence is less than a preponderance, but more than a scintilla. *Jesurum, 48 F.3d at 117.*

FN8. The Court applied this standard by analogy from decisions addressing the meaning of substantial evidence in the context of the *National Labor Relations Act § 10(e). Richardson v. Perales, 402 U .S. 389, 401; 28 L.Ed. 842; 91 S.Ct. 1420 (1971* (citing *Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)* ).

### III. Discussion

### a. ALJ's Denial of Benefits

When deciding whether a claimant is entitled to disability benefits, an ALJ should consider both subjective complaints of pain, and the claimant's medical records. *Wimbley v. Massanari, 2001 WL 761210 (D.Del.2001).* The ALJ must give the plaintiff's complaints of pain serious consideration, even if those complaints are not supported by the medical evidence. *Id.* However, "when a claimant's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as physicians' reports and claimant's daily activities. Additionally, the ALJ may properly look at

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
**(Cite as: Not Reported in F.Supp.2d)**

the claimant's stated daily activities to assess credibility." *Id.*

When reviewing a decision, the district court must defer to the ALJ's determinations on the credibility of the witnesses and on whether the claimant has satisfied the burden of proof. *Murry v. Apfel, 1999 U.S.App. Lexis 28911 (9th Cir.1999); Davis v. Califano, 439 F.Supp. 94, 98 (E.D.Pa.1977).* "Great deference is given [to the ALJ's] judgment as fact-finder, since he actually heard the witnesses' testimony and observed their demeanor. 'Most particularly, the administrative law judge to whom the Secretary delegated fact finding responsibilities, must decide issues of credibility and appropriate weight to be given the exhibits." ' *Davis, 439 F.Supp. at 98.*

**\*6** "A finding that a witness is not credible must be set forth with sufficient specificity to permit the court to engage in an intelligible review of the record." *Hanratty v. Chater, 1997 U.S. Dist. LEXIS 15488 (W.D.N.Y.1997).*

The ALJ's denial of benefits was based on substantial evidence. In his decision, the ALJ noted that Morgan testified to severe pain. The ALJ found that some of Morgan's complaints of pain were credible. However, in light of Morgan's daily activities which included cooking, cleaning, doing laundry, reading, watching television, caring for and transporting her children to and from school, and caring for an infant, the ALJ found that Morgan's testimony concerning the extent of her pain was not fully credible. Additionally, the ALJ relied on medical records which indicated that she had full range of movement, and considered the inconsistencies in Morgan's testimony concerning her ability to perform housework, and to sit for extended periods of time. This court must give deference to the ALJ's assessment of Morgan's credibility. Furthermore, there is objective evidence which suggests that plaintiff has exaggerated pain. A medical report from Morgan's physical therapist stated: "[on] the pain questionnaire the patient scored very high indicating symptom exaggeration or fear of movement ." *D.I. 10 at 235.* Thus, there is substantial evidence in the record to support the ALJ's decision.

### b. Listed Impairments

In step three of the administrative process previously discussed herein, an ALJ must compare the claimant's injuries with those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Morgan argues that the ALJ erred in finding that her impairments did not equal the listed impairments. Specifically, she argues that her physical impairments fall under 1.09(A) and 1.09(C); and that her mental impairments fall under 12.04 A(1), 12.04(B), and 12.06.

In order to equal a listed impairment under 1.09(A) or (C) a claimant must show that her impairment affects both hands, or one hand and one foot. Morgan claims that she has problems with her left hand, resulting from overuse. She also asserts that her hip pain prevents her from walking and standing. Plaintiff argues that when taking these impairments as a whole, she is disabled.

The ALJ held that when taking all the evidence into account, Morgan's injuries did not meet the listed impairments. He based his finding on the credibility he assigned to Morgan's subjective complaints of pain and the medical records. As previously discussed, the ALJ did not find Morgan's testimony concerning the extent of her pain credible because her own testimony and that of her house-mate contradicted her contentions regarding the inability to do housework and sit for long periods of time. Since the ALJ attached less significance to plaintiff's complaints, he found that her impairments did not rise to the level of a listed impairment. There is nothing in the record to suggest that the injuries to plaintiff's hip and left arm are of such severity that the combination of those injuries with the right wrist injury satisfies 1.09. As previously discussed, medical records from 1996 and 1998 show that Morgan had decreased right wrist function, but that she had full range of movement in her other extremities. Thus, the ALJ's finding that Morgan's injuries did not equal a listed impairment was supported by substantial evidence.

**\*7** At the time of the ALJ's decision, in order to equal a listed impairment under 12.04 or 12.06, a claimant had to show two of the following: "(1) [m]arked restriction of activities of daily living; or (2)[m]arked difficulties in maintaining social functioning; or (3)[d]eficiencies of concentration, persistence, or pace resulting in a frequent failure to complete tasks in a timely manner; or (4)[r]epeated episodes of deterioration...in work-like settings which cause the individual to withdraw from that situation."

In his decision, the ALJ noted that Morgan was able to do light housework, care for her children, meet with her friends, and watch television for long

Not Reported in F.Supp.2d                                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: Not Reported in F.Supp.2d)

periods of time. He based these findings on the plaintiff's testimony which he found only partially credible, and Dr. Reynolds' psychological assessment. Dr. Reynolds found that Morgan suffered from post-traumatic stress syndrome, which limited her ability to handle certain mental stressors. However, he also found that Morgan was able to "follow work rules...function independently... interact with supervisors...use judgment; understand, remember...carry out simple and detailed job instructions; and maintain personal appearance." *D.I. 10 at 15.* Again, the ALJ's credibility determinations are entitled to deference from this court. Additionally, plaintiff presented no other evidence regarding her mental impairments.[FN9] Thus, the ALJ's finding that plaintiff's mental impairments did not rise to the level of the listed impairments was based on substantial evidence.

> FN9. Dr. Reynolds' report generally described plaintiff's daily routine, and mental state, but did not evaluate whether Morgan's mental impairments equaled those listed in 12.04 and 12.06.

Finally, Morgan argues that the ALJ failed to consider the disabling effect of her combined injuries. However, as mentioned above, the ALJ found that plaintiff's impairments failed to equal the listed impairments whether they were evaluated individually or as a group. The ALJ stated: "Claimant's complaints of pain are exaggerated...the medical evidence fails to establish that she has sought any additional treatment for her impairments...[she] does not require an ambulatory device...[and she] takes no significant pain medication." *Id. at 17.* Further, the ALJ gave ample support for these conclusions in his opinion where he discussed both Morgan's physical and mental impairments.

### b. Vocational Evidence

Morgan argues that even if the court finds that her impairments do not equal the listed impairments, she is still disabled because there are insufficient employment opportunities for a person with her mental and physical limitations. To support her argument, Morgan relies on two Social Security Rulings, SSR 96-9p and SSR 83-14.

Under 96-9p, when a claimant does not have the ability to do the full range of sedentary work, the ALJ's assessment of disability should follow certain guidelines. The ALJ should "show the presence and degree of any specific limitations and restrictions...[provide]...an explanation of how the evidence in the file was considered...[and state]...[t]he individual's maximum remaining capacities to perform sustained work on a regular and continuing basis." *Id.*

**\*8** At the hearing, the ALJ heard testimony from a vocational expert. *D.I. 10. at 106.* The expert concluded that a person with Morgan's limitations could perform less than the full range of sedentary work. *Id. at 107.* At the hearing, the ALJ posed a hypothetical containing many of Morgan's impairments and limitations to the vocational expert, asking if a person with such impairments would be able to find employment. *Id. at 18, 19.* The expert stated that such a person would be able to find employment, and provided the number and examples of jobs available to a person with those limitations. [FN10] Then the ALJ asked the expert whether Morgan would be able to work, if he were to credit all of her testimony. *Id. at 110.* The expert stated that a person with such impairments would be incapable of finding employment. *Id.*

> FN10. *See id. at 19.* The expert opined that "such an individual could perform 25 percent of the sedentary occupational base...[and]... identified several unskilled, sedentary occupations such as a security worker (65,000 jobs nationally, 2,800 locally); quality control worker (39,000 nationally, 1,100 locally); and receptionist (41,000 nationally, 1,200 locally)." *Id.*

In his opinion, the ALJ discussed both Morgan's physical and mental conditions and the limitations caused by those conditions. *Id. at 13-16.* The ALJ also explained that he did not fully credit Morgan's testimony. *Id. at 19.* Further, he stated "[b]ased upon all of the evidence of record, including oral testimony from the vocational expert, claimant and witness, the Administrative Law Judge...finds that there are other jobs in the national economy which the claimant could perform and that those numbers are significant." *Id.* Thus, the ALJ followed the guidelines set forth in 96-9p in reaching his decision which was supported by substantial evidence.

Additionally, plaintiff relies on Social Security Ruling 83-14 to argue that someone with decreased bilateral manual dexterity is unable to perform sedentary work. Plaintiff argues that she is disabled

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: Not Reported in F.Supp.2d)

because her lack of bilateral manual dexterity significantly erodes the employment base. *D.I. 15 at 31.* However, the ruling only states that such limitations *can* affect the capacity to perform work. *SSR 83-14.* The question of whether the limitations actually limit a claimant's ability, should be left to the ALJ. In this case, the ALJ held that Morgan's testimony regarding pain was not entirely credible, thus finding that she could perform activities with less pain than she claimed to endure while performing those activities. Based on the evidence in the record, that finding was supported by substantial evidence.

c. Commissioner's Subsequent Grant of SSI Benefits

Finally, plaintiff argues that the Commissioner's subsequent grant of supplemental security income, effective in May of 2000, is new evidence showing that Morgan was disabled as of August 1993. Thus, the ALJ erred in denying plaintiff's application for disability benefits, period of disability, and supplemental security income for the period prior to May 2000.

42 U.S.C. § 405(g) sets forth requirements for courts deciding whether to remand a case in light of new evidence. The section states: "[t]he court may... order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is a good cause for the failure to incorporate such evidence into the record in a prior proceeding."

*9 In *Matthews v. Apfel, 239 F.3d 589, 592-93 (3d Cir.2001)*, the Third Circuit applied the § 405(g) requirements, and addressed the issue raised by Morgan's arguments. In that case, the court explained that when the Appeals Counsel declines to review an ALJ's decision, and a "claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner *but only if* the evidence is new and material *and* if there was good cause why it was not previously presented to the ALJ." *Id. at 593* (emphasis added).

This circuit defined "material evidence" in *Szubak v. Sec'y of Health and Human Services, 745 F.2d 831, 833 (3d Cir.1984)*. The court noted that material evidence must be both relative and probative. *Id.* It stated: "[t]he materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's

determination." *Id.* Most importantly, the court held that "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.*

Assuming *arguendo* that there is new evidence in this case, this court cannot consider it in deciding whether the ALJ's decision was based on substantial evidence because the evidence was not presented to the ALJ. *Matthews, 239 F.3d 589, 593*. However, the court may remand the case to the Commissioner if the evidence is (1) new, (2) material, and (3) plaintiff has good cause for failing to present the evidence to the ALJ. *Id.*

Morgan attached a copy of a letter notifying her that she was entitled to SSI benefits from May 2000. However, beyond the assertions in her brief, she presented nothing to this court indicating that what was in evidence in her first and second applications was the same. Therefore, this court is unable to evaluate whether the second application contains new or different medical assessments. A mere finding of entitlement in 2000 does not confirm the same or similar disability existing in 1993, seven years earlier.

However, Morgan argues that the grant of benefits, alone, is new evidence of her previous entitlement to such benefits. Applying a similar set of facts, the Eleventh Circuit found that a subsequent grant of supplemental security benefits was not relevant when evaluating whether a prior denial of benefits was based on substantial evidence. *Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir.1999)*. In that case, the claimant appealed the ALJ's decision that Wilson did not suffer from a severe impairment. *Id.* The claimant attempted to introduce new evidence regarding disability before the Court of Appeals. *Id.* The court held that the new evidence was irrelevant to the ALJ's prior denial of benefits. *See id.*

This court adopts the rational present in the *Wilson* case as consistent with the approach the Third Circuit has taken regarding new evidence. Thus, Morgan's entitlement to supplemental security benefits in 2000, is not new evidence for purposes of reviewing the ALJ's denial of benefits approximately two years prior.

*10 In light of this court's finding regarding the new evidence element, evaluation of the remaining factors

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
**(Cite as: Not Reported in F.Supp.2d)**

is not necessary, since all of the factors must be present in order to remand a case to the Commissioner. However, the Court will evaluate the other factors discussed in *Matthews.*

Under the standard set forth in *Szubak,* in order to be material, the new evidence must concern the same relevant time period as in the ALJ's decision denying benefits. *Szubak, 745 F.2d 831, 833.* As stated above, there is nothing in the record to indicate that plaintiff was eligible for benefits in 1993. Her eligibility for benefits in 2000, the only evidence before the court, is not material evidence showing that she was also entitled to benefits in 1993. Even if the genesis of the disability is the same, Morgan's condition may have subsequently deteriorated over the years, thereby increasing the severity of the disability and entitling her to benefits. As a result, the grant of benefits in 2000 alone, is not material evidence relating to Morgan's eligibility for benefits in 1993. Thus, plaintiff has failed to satisfy the second *Matthews* factor.

Plaintiff has similarly failed to meet the requirements of the third factor, good cause. In *Szubak,* the Third Circuit discussed this requirement noting: "claimants should generally be afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak, 745 F.2d 831, 834.* Morgan presented no evidence which would explain the discrepancy between her eligibility in 2000 and her ineligibility in 1993. Again, she simply asserts that even in the absence of any new medical records in 2000, her eligibility proves that the ALJ erred in denying benefits for 1993. As previously stated herein such arguments are not supported, and cannot serve as the basis for good cause. Moreover, Morgan was given a fair opportunity to present her case to the ALJ, and seek the appropriate appeals. Remanding the case because of the Commissioner's 2000 eligibility determination would provide plaintiff with additional opportunity to present her case, thus giving her greater rights than the statute intended to grant.[FN11] Therefore, plaintiff has failed to show good cause.

> FN11. *Szubak, 754 F.2d 831, 834.* Plaintiff's "another bite at the apple" argument is inconsistent with 42 U.S.C. § § 423, 405.

IV. Conclusion

For the reasons discussed, this court finds that substantial evidence supported the ALJ's decision to deny disability benefits, period of disability, and supplemental security benefits. Viewing all the relevant facts in a light most favorable to the plaintiff, no reasonable jury applying the 'substantial evidence' standard could find for the plaintiff. Consequently, the defendant's motion for summary judgment is GRANTED, and the plaintiff's motion for summary judgment is therefore DENIED. An order consistent with this opinion will follow.

D.Del.,2002.
Morgan v. Secretary of Health, Human Services
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

dover psychological services, p.a.
therapy  consulting  testing
adult  adolescent  children  family
1169 s. state st., dover, delaware  19901
674 0834

6 January 2003

NOTE: this report is strictly CONFIDENTIAL and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any ...

TO:        James Carter
           Vocational Rehabilitation Counselor

FROM:      Adolf Angermeier, Ph.D., P.A.
           Clinical Psychologist

RE:        **FRANK S. DISMORE**
           DOB    56      Age: 46 yrs, 7 mos

Test Date: 12/18/02

Tests Administered:
WAIS-R
WRAT-3
MMPI
VRII

PRESENTING DISABILITY:
       The consumer claims he has a Learning Disability.  More specifically,
he told me during the interview that it is Dyslexia.  He also feels that
he has ADHD, but has never been treated.  He indicates that he would like
to pursue the computer field and become certified.  He also brought up
that he is part of an experimental program - he gets injections for the
prevention of HIV; he didn't expand on that however.  Frank also stated
that he had some college in the Business Administration area, and that was
in 1997 when he was in California.


PURPOSE:
       He was referred for a psychological in order to determine what his
present intellectual/academic achievement functional levels are, as well
as his emotional/mental status and potential vocational interest areas in
addition to his interest in the computer field.


APPEARANCE, BEHAVIOR, ATTITUDE:
       Frank was on time for the appointment; was casual in appearance.  He
stated that even though he had Dyslexia, he basically had good grades in
school - C's, B's, and some A's.  He never expanded on the question in
reference to the ADHD.  I felt he was somewhat elusive; he seemed to get
uncomfortable some areas, so I left it alone.

       When it came to formal testing, he was relatively quick.  He seemed
to make up his mind fast as to whether he knew something or didn't know
something.  Overall he appeared to have a projected sense that he is a
capable individual.

FRANK S. DISMORE
Page 2

## INTELLECTUAL FUNCTIONING:

### Wechsler Adult Intelligence Scale - Revised (WAIS-R):

| Subtest | Scaled Score | %ile Rank |
|---|---|---|
| **Verbal:** | | |
| Information | 11 | 63 |
| Digit Span | 7 | 16 |
| Vocabulary | 15 | 95 |
| Arithmetic | 12 | 75 |
| Comprehension | 12 | 84 |
| Similarities | 12 | 75 |
| **Performance:** | | |
| Picture Completion | 9 | 37 |
| Picture Arrangement | 10 | 50 |
| Block Design | 13 | 84 |
| Object Assembly | 12 | 75 |
| Digit Symbol | 7 | 16 |

### IQ Scores:

| | | | | %ile |
|---|---|---|---|---|
| Verbal | IQ | 113 | High Average Range | 81 |
| Performance | IQ | 112 | High Average Range | 79 |
| Full Scale | IQ | 113 | High Average Range | 81 |

### IQ Ranges:

A Full Scale IQ score of 113 may vary between 108 and 118 in nine of ten reevaluations.  Taking measurement error and normal variation into account, there is a ninety percent chance that the true Full Scale IQ score will be within this range.

The true Performance IQ score is in the range 102 to 121.
The true Verbal IQ score is in the range 108 to 118.

## ACADEMIC PROFICIENCIES:

### Wide Range Achievement Test (WRAT-3) results:

| | | Std. | %ile |
|---|---|---|---|
| Reading/Word Recognition | Beginning High School | 88 | 21 |
| Spelling | Beginning 8th Grade | 87 | 19 |
| Written Arithmetic | Beginning High School | 96 | 39 |

## INTERPRETATION OF INTELLECTUAL ABILITIES AND ACADEMIC PROPICIENCIES:

Frank's Cognitive/Intellectual Profile - consisting of Frank's Wechsler scores and Wide Range Achievement scores in terms of percentile ranking - is plotted on Graph 1.

From Graph 1 it can be seen that intellectually overall Frank is actually quite strong, with an 81 %ile in the Verbal area overall, and a 79 %ile in the Performance functions.

Subtest analysis of the Verbal area reveals that five out of the six Verbal functions are quite strong; only one - namely Listening Ability, which was only at the 16 %ile - is indicative of Severe Developmental Learning Disability in light of the Verbal profile as well as the Performance Profile.

FRANK S. DISMORE
Page 3

Within the Performance functions he had a mixture of strong abilities with limited abilities. His strong abilities are Spatial Reasoning-Abstract Reasoning, which was at the 84 %ile; Visual Perceptual Memory-Visual Perceptual Spatial Integration was also quite strong, 75 %ile. Visual Perceptual Discrimination was only 37 %ile, and Short Term Visual Learning/Eye-Hand Coordination was only 16 %ile.

The low score in the Short Term Visual Learning/Eye-Hand Coordination, in contrast to the other high scores of his Wechsler profile, usually means that - even though he is very capable - intellectually he is a very slow individual who needs time in processing as far as learning new information.

Academic Proficiency: His Reading is at the 21 %ile, which - because of his age being 46 - falls at the beginning of high school level. Spelling is at the 19 %ile, relating to the beginning of 8th grade level. Written Math is 39 %ile, beginning of high school level.

Just looking at the Intellectual Profile, one can see that the academic skills in reference to the Cognitive Profile of the Wechsler, there are really significant barriers to him developing and functioning at that intellectual level that emerges from the Wechsler. I would conclude that, in fact, both the Reading and the Spelling are indicative of Severe Developmental Learning Disability, and the Math is moderate to severe.

EMOTIONAL/MENTAL MAKE-UP:
    MMPI results and clinical observations:
    Frank generated an elevated MMPI profile with the high scores in the Masculine/Femininity, the Paranoia, the Schizophrenia, and the Depression scale. Functionally the Depression elevation is the most significant one as far as causing significant potential barriers, and impairment to thinking and reasoning.

Frank was also somewhat as elusive on the MMPI as he came across clinically interpersonally. It appears that the MMPI was almost too open, too critical of himself - which would then result in presenting himself as more disturbed or in need of more help than, in fact, is the reality. As such, with the exception of the Depression, no specific pathology emerges but a lot of borderline kinds of components seem to be indicated. It appears that behaviorally and functionally this does not result in a major impairment.

It is interesting to note, however, that Frank's application for Social Security Disability was denied, but he still seems to pursue that. I am not sure whether the present picture that he presents on the MMPI is somewhat related to him seeing himself as more impaired than in fact he objectively may be.

3A

# dover psychological services, p.a.
## 1169 s. state st., dover, delaware  19901
### 302/647-0834

FRANK S. DISMORE
Page 4

VOCATIONAL INTEREST INVENTORY:
Graph 2 is an overview of the scores that Frank obtained on the twelve occupational interest areas, and plots these scores between the ranges of low and high.

| INTEREST AREA | % | LOW | AVERAGE | HIGH |
|---|---|---|---|---|
| 01 Artistic | 99 | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| 02 Scientific | 65 | xxxxxxxx | xxxxxxxx | |
| 03 Plants/Animals | 70 | xxxxxxxx | xxxxxxxx | x |
| 04 Protective | 38 | xxxxxxxx | x | |
| 05 Mechanical | 66 | xxxxxxxx | xxxxxxxx | |
| 06 Industrial | 42 | xxxxxxxx | xx | |
| 07 Business Detail | 50 | xxxxxxxx | xxxx | |
| 08 Selling | 72 | xxxxxxxx | xxxxxxxx | x |
| 09 Accommodating | 50 | xxxxxxxx | xxxx | |
| 10 Humanitarian | 16 | xxxx | | |
| 11 Lead/Influence | 35 | xxxxxxxx | x | |
| 12 Physical Performing | 58 | xxxxxxxx | xxxxxx | |

From Graph 2 one can see that three categories emerge as possible focuses in career development. One of them is the **ARTISTIC** which basically relates to creativity. Another one is **PLANTS/ANIMALS**, and the third one is **SELLING**. As such none of these categories really directly relate to the career focus that Frank is interested in - namely, the **Computer Field**, and to be an Analyst eventually. Intellectually he certainly has the ability to do just about anything he can, with the emphasis being a career or a job where Writing and Reading are not the major issues. Perhaps it is for this reason that Frank is pursuing, where the computer skills in themselves really constitute reasonable accommodations.

SUMMARY:
1) Intellectually Frank clearly has very solid endowment in a majority of cognitive areas. His potential to handle college-based training such as Computer Skill Acquisition is good.

2) Significant Developmental Learning Disability exists, and a host of reasonable accommodations will have to be provided. Since he is focusing on developing computer skills/computer certification, that in itself would constitute a major part of his reasonable accommo-dations. I would add to it that he should get training on the voice-operated computer system, and for test-taking he be given extra time.

FRANK S. DISMORE
Page 5

3)    Frank generated an elevated MMPI profile with a number of personality
      components and emotional components - the major one being the level
      of Depression that needs to be treated.  It also needs to be noted
      that Frank appears over-exaggerate as a result of his overrating his
      psychological problems.

4)    The field of **Computer Skill Acquisition/Certification** would be a good
      field for Frank, since it - in itself - would constitute reasonable
      accommodations, and would help him minimize existing his learning
      disorder in reference to Reading and Spelling.  Personality-wise I
      think he would be better in working with objects and things, and
      people as well.

CONCLUSION:
      Even though Frank appears to be intellectually very capable and has
high potential, he came across as evasive and elusive.  This may relate to
a feeling of inadequacy that is, and has been, generated by the Develop-
mental Learning Disabilities, and also the Attention Deficit Disorder,
which most likely is primarily the Inattentive Type.   It should be
explored to be treated with medication.  Prognosis for Vocational Rehabil-
itation is guarded.

DIAGNOSTIC IMPRESSION:
      315.00      Reading Disorder
      315.1       Mathematics Disorder
      315.2       Disorder of Written Expression
      314.00      Attention Deficit Disorder, primarily Inattentive Type
      301.9       Personality Disorder NOS


                              Respectfully,



                              Adolf Angermeier, Ph.D., P.A.
                              Clinical Psychologist


AA/l
Enclosure

DICTATED BUT NOT READ

# EXHIBIT F

**C**

Tribuani v. MBNA America Bank N.A.
D.Del.,2005.

United States District Court,D. **Delaware**.
Tammy TRIBUANI, Plaintiff,
v.
MBNA AMERICA BANK N.A., Defendant.
**No. Civ. 03-351-SLR.**

March 31, 2005.

Gary W. Aber, Heiman, Aber, Goldlust & Baker,
Wilmington, DE, for Plaintiff.
Scott A. Holt, Young, Conaway, Stargatt & Taylor,
Wilmington, DE, for Defendant.

MEMORANDUM ORDER
**ROBINSON**, J.

## I. INTRODUCTION

*1 Plaintiff Tammy Tribuani filed this action on
April 7, 2003, against defendant MBNA America
Bank, N.A. alleging defendant violated the
Americans with Disabilities Act ("**ADA**") by
terminating her employment and refusing to rehire
her based on her "Bipolar Disorder." (D.I. 38 at B-5)
In addition, plaintiff contends that defendant
retaliated against her for requesting a reasonable
accommodation and that defendant's violation of the
**ADA** was willful and intentional, thus causing her
severe emotional distress. (*Id.* at B-7) Plaintiff is
seeking damages for lost wages, medical expenses,
pain and suffering, attorney fees, litigation and court
costs, as well as punitive and exemplary damages and
injunctive relief in the form of reinstatement or front
pay. (*Id.*) On August 10, 2004, plaintiff withdrew the
retaliation and intentional infliction of emotional
distress claims. (D.I. 37 at 1, n. 2)

This court has jurisdiction pursuant to 28 U.S.C. §
1331 and 28 U .S.C. § 1343. Currently before the
court is defendant's motion for summary judgment
pursuant to Federal Rule of Civil Procedure 56(b).
(D.I.32) For the reasons stated below, defendant's
motion shall be denied.

## II. BACKGROUND

Defendant is headquartered in Wilmington,
**Delaware** and employs approximately twenty-five
thousand people nationwide. (D.I. 38 at B-11)

Defendant has adopted and implemented several
policies governing its personnel, including an
attendance policy which limits full time employees to
ten occasional absences per calendar year.[FN1] (D.I. 38
at B-74) Defendant's managers are required to keep
attendance records and issue absence warnings, either
by a notice, second notice, or dismissal, when they
consider an employee's combination of days absent
and occurrences to be excessive. (*Id.* at B-75, 89)

> FN1. Each time an employee is absent,
> whether for one, two, or three days, it is
> regarded as a single occasional absence
> "occurrence;" the days absent are counted
> for control purposes. (D.I. 38 at B-75, 88)

An employee absent for more than three consecutive
work days due to personal illness is eligible for
disability leave and no occurrences or absences will
accrue if the employee is absent for at least three
weeks or hospitalized. [FN2] (*Id.* at B-76) Defendant
requires that the employee provide adequate medical
evidence of the disability within fifteen days of its
onset and may require, prior to reinstatement,
certification from a health care provider that the
employee is able to return to work. (D.I. 38 at B-83)
Employees on disability leave are paid, however,
there is no job security for absences lasting longer
than three months.[FN3] (D.I. 34 at A-10, 11)

> FN2. If these conditions are not satisfied, the
> first three days of the disability would be
> counted as three days absent and a single
> occurrence. (*Id.*)

> FN3. For instance, if an employee is away
> from work for more than twelve months,
> there is no job placement and the person
> must reapply for the position. An
> individual's health and safety should not be
> considered in a rehire situation.
> Additionally, all time away from work on
> short term disability, FMLA, hardship, or
> long term disability leave is cumulative in a
> rolling twelve month period. (*Id.*)

Another personnel policy utilized by defendant is the
periodic appraisal of employee performance. Under
this system, managers rate their employee's
performance according to quality control factors and
specific goals to be achieved.[FN4] (D.I. 38 at B-24)
The employee's overall performance plan rating
would then be defined as either superior, excellent,
satisfactory, or unsatisfactory. (*Id.* at B-25)

FN4. The factors considered are goals and achievements accomplished, quality of work, productivity, communication skills, leadership and interpersonal effectiveness, attendance and punctuality, and job knowledge. (D.I. 38 at B-23)

Plaintiff began her employment with defendant on August 2, 1993 at defendant's Newark, **Delaware** location as a customer assistance representative. (D.I. 34 at A-15, 16) Her primary duty was to contact consumers by telephone and collect on delinquent credit card accounts. (*Id.* at A-17) On February 2, 1994, plaintiff received her first performance review which ranked her in the excellent category and indicated she was a "Top Performer" on two occasions. (D.I. 38 at B-22) In 1994, plaintiff began seeing Dr. Sager, a psychologist, due to her depressive state and moodiness. She was prescribed many medications to stabilize her condition.[FN5] (D.I. 38 at B-112)

FN5. It was not until Dr. Sager referred plaintiff to Dr. Kaye in 1998, that the effective medications were prescribed to stabilize her disorder.

\*2 In 1995, plaintiff voluntarily transferred to defendant's new customer service facility in Camden, Maine to help train employees at that location. (*Id.* at A-19) Plaintiff's performance was evaluated again in August of 1995 and her overall rating remained in the excellent category. (D.I. 38 at B-28) On November 18, 1995, plaintiff was issued a First Notice warning for her absences.[FN6] (D.I. 34 at A-28) Approximately one year later, plaintiff was transferred back to defendant's Newark, **Delaware** location at her request. (*Id.* at A-18) Upon her return to **Delaware**, she was promoted and given a pay raise. (*Id.* at A-19,20) On February 2, 1996, plaintiff was evaluated and was once again rated as excellent. (D.I. 38 at B-30) On May 16, 1996, plaintiff was issued another First Notice warning for her absences because she had exceeded the limit set in the attendance policy. (*Id.* at A-34, 5)

FN6. At the time the notice was issued, plaintiff had accrued six occasional absences with six occurrences. (D.I. 34 at A-28)

On December 24, 1996, plaintiff applied for and received an insurance specialist position at defendant's Newark branch, which increased her salary and employability. (*Id.* at A-21) Plaintiff's new position consisted of the sale of insurance policies to defendant's customers with good credit. (D.I. 33 at 6) Plaintiff's performance was reviewed on January 21 and August 1, 1997. (*Id.* at 37, 44) Her January review ranked her superior, but indicated that she needed to "better plan her schedule to meet the business needs of MBNA America." (*Id.* at 40) The August review ranked plaintiff as excellent. Additionally, during this period plaintiff was a "Top Performer" twice and was awarded with the "Tool Time" and "Customer Service All Star" merits. (D.I. 38 at B-33)

Plaintiff's final performance review was in February of 1998 and she was once again ranked in the excellent category. (D.I. 38 at B-51) On February 18, 1998, plaintiff was placed on verbal warning for accepting a car insurance policy from Ms. Jeanne Mooney without first obtaining the driver license number of Ms. Mooney's daughter (the operator of the vehicle) and failing to review numerous key points with Mrs. Mooney.[FN7] (D.I. 34 at A-111) The warning remained permanently in plaintiff's file, prevented her from posting for new positions for six months and rendered plaintiff ineligible for her monthly incentive bonus of one thousand dollars. (D.I. 34 at A-44)

FN7. This call violated defendant's policy requiring that the "license numbers of all [vehicle] operators be obtained prior to recording an acceptance" of an insurance policy and "that all points on the recording script be thoroughly reviewed with the customer." (*Id.*)

Plaintiff disputed the warning and began emailing Jim Steele ("Steele"), her manager, about the warning and its effect upon her compensation.[FN8] (*Id.* at A-47) In return, Steele emailed plaintiff that she needed to get back to work taking calls and making sales. (*Id.* at A-48) Plaintiff claims that she began feeling sick and called a nurse from defendant's Health and Safety Services Department for help. While she was waiting for the nurse to return her phone call, Steele "came up behind [plaintiff] and scared [her] half to death, and ... that is when [she] really got upset." (*Id.* at A-50) Plaintiff acknowledges that Steele merely touched her on the shoulder and that the gravity of the situation was heightened since the warning was given to her on the anniversary of her husband's death. (*Id.*)

FN8. Steele also administered the February 18, 1998 warning. (D.I. 33 at 6)

*3 That same day plaintiff went to see Dr. Sager. Dr. Sager prescribed Xanax, which made plaintiff tired. Plaintiff was told to "rest for awhile" and, as a result, plaintiff took several vacation days and then took short term disability leave. (*Id.* at A-52) She returned to work on March 18, 1998 but, after a few hours on the job, she began crying uncontrollably and called Dr. Sager to inform him she could not work. (*Id.*) Plaintiff attempted to return to work again on a part time basis in the basement file room ("until [she] got her feet wet"), however, this too was unsuccessful and plaintiff went "out" on short term disability. (*Id.* at A-53)

In March of 1998, Dr. Sager referred plaintiff to Dr. Kaye, a psychologist, for a second opinion. Dr. Kaye properly diagnosed plaintiff as suffering from Bipolar Disorder Type II, a chronic, episodic condition which caused plaintiff to be substantially limited in her major life activities such as concentrating, engaging in social interactions and caring for herself. FN9 (D.I. 38 at B-15) After being diagnosed, plaintiff went through a "gamut of medications" to stabilize her condition. (D.I. 34 at A-72) Dr. Kaye utilized a prophylactic medicinal treatment approach in an attempt to prevent the cycles. Mood stabilizers, or "drugs that would prevent things from getting out of control," eventually stabilized plaintiff's condition. (*Id.* at B-185) Nevertheless, in June of 1998, plaintiff went on short term disability leave. (D.I. 33 at 7) On November 24, 1998, after plaintiff's short term disability benefits had expired, plaintiff applied and qualified for long term disability. (D.I. 37 at 8)

FN9. Bipolar disorder or manic-depressive disorder is extremely difficult to diagnose, so much so that the "average person sees a psychiatrist for about seven years before being correctly diagnosed." (D.I. 38 at B-158) The disorder is characterized by the "cycling" of euphoric and severe depressed mood states. (*Id.* at B-159) Cycling is not under the control of the individual and can be triggered by external stressors. (*Id.* at B-168) Other characteristics include personality disorders with dependent features and some features of an adult child of an alcoholic. (*Id.* at B-160) Dr. Kaye found that plaintiff contained many of these symptoms.

In the summer of 2000, plaintiff attended a job fair held by defendant to determine if defendant was hiring collectors. Plaintiff was instructed to contact Linda Anthony ("Anthony"), a Personnel Generalist. Anthony informed plaintiff that she needed to obtain a return to work authorization from her physician before she could return to work. (D.I. 33 at 9) Dr. Kaye issued the authorization on December 12, 2000, which stated that plaintiff could return to work at a "comparable position as the one she was working on." Dr. Kaye believed that plaintiff's mood was stable, her medications were reasonable, that plaintiff had a good understanding of her illness, and could monitor her illness if adjustments were necessary. (D.I. 34 at A-150) Plaintiff then submitted the memo to Anthony. FN10 (D.I. 37 at 1)

FN10. Plaintiff's long term disability benefits expired and employment was terminated upon defendant's receipt of plaintiff's medical release or return-to-work authorization from Dr. Kaye.

Around December 19, 2000, plaintiff met with Anthony. At the meeting plaintiff was asked to complete an employment application and was interviewed by Amy Russell ("Russell"), a member of the Recruitment Department. According to defendant's normal procedures, Russell requested a copy of plaintiff's file which contained all plaintiff's disciplinary actions, attendance records, and her last two performance appraisals. (D.I. 34 at A-154)

Defendant contends that since few, if any, of its employees seek re-employment after being absent for two and one half years, the issue of plaintiff's rehire was raised at a "People Issue" meeting on January 4, 2001. FN11 (D.I. 33 at 10,11) In raising the issue, plaintiff's identity was not revealed, however, it was mentioned that the rehire candidate had past performance issues and had previously been on corrective action for attendance. Amy Milligan, the Director of Health and Safety Services, recognized plaintiff's employment history and stated that the employee was noncompliant with her treatment plan while on short term disability. (D.I. 34 at A-174) The group decided to deny plaintiff's application based on her past warnings. (*Id.*) Plaintiff was notified of the decision by Noel Wolhar. Plaintiff claims that Wolhar informed her that she was not rehired due to her extensive absences and poor performance reviews. (D.I. 33 at 22)

FN11. The "People Issue" is a group

comprised of defendant's senior representatives from Personnel, Security, and Health and Safety Services departments whose role is to address unusual or procedural issues raised by personnel representatives. The exact issue raised was whether an individual who had been out on long term disability and lost all job security rights should be treated as an internal or external candidate. (*Id.*)

*4 On March 16, 2001, plaintiff filed a charge of discrimination alleging that defendant terminated her or failed to rehire her because of her disability or external candidate. (D.I. 34 at A-118) On November 30, 2001, the **Delaware** Department of Labor found reasonable cause to believe a violation occurred. (D.I. 38 at B-15,18) The Equal Opportunity Commission issued a right to sue letter on January 10, 2003. (D.I.B-10) Plaintiff filed suit on April 7, 2003.

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff there exists, sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

### IV. DISCUSSION

Plaintiff claims that she was the victim of discrimination because her employment was terminated due to a real or perceived disability. Plaintiff asserts that when she applied for re-employment in December of 2000, there were several collections positions available for which she was qualified, but defendant refused to hire her due to her disability.

*5 Claims brought under the **ADA** are analyzed under a burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, plaintiff must first establish a prima facie case of unlawful disability discrimination.[FN12] In order to state a prima facie case under the **ADA**, the plaintiff must establish that: (1) she has a disability; (2) she is otherwise qualified to perform the essential functions of the job, with or without accommodation by the employer; and (3) she has suffered an adverse employment action because of the disability. *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998). The **ADA** defines disability as: (1) a physical or **mental impairment** that substantially limits one or more of the major life activities of [an] individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2).

> FN12. Circumstantial evidence cannot be offered to prove plaintiff is an individual covered under the **ADA**. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667-8, (3d Cir.1998).

If plaintiff makes a prima facie showing of discrimination, the burden shifts to defendant to establish a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas Corp., 411 U.S. at 802.* If defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must, "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.1996)* (en banc).


A. Prima Facie Case [FN13]


FN13. Elements two and three of the prima facie case are undisputed and accordingly will not be addressed.


1. Substantially Limiting Disability

EEOC regulations interpreting the **ADA** define "major life activities" as functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See 29 C.F.R. § 1630.2(i) (1997).* EEOC regulations further define "substantially limited in the major life activity of working" as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, when compared with the ability of the average person with comparable qualifications to perform those same jobs." *29 C.F.R. Pt. 160, App. § 1630.2(j)(3).* The inability to perform a single, particular job does not constitute a "substantial limitation in the major life activity of working." *Id.*

The regulations suggest that several considerations are relevant in determining whether an individual is substantially limited in the major life activity of working. These factors include: (1) the geographic area to which the individual has access; (2) the job from which the individual has been disqualified because of an impairment and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographic area, from which the individual is also disqualified because of the impairment; and (3) the job from which the individual has been disqualified because of an impairment, and the number of other jobs not utilizing similar training, knowledge, skill, or abilities, within that geographical area from which the individual is also disqualified because of impairment. *Id. § 1630.2(j)(3)(ii)(A)-(C).*

*6 In determining whether a plaintiff is substantially limited in one or more of these activities, the regulations advise the courts to consider the nature and severity of the impairment, the duration of the impairment, and the permanent, long term impact resulting from the impairment. *Id. at § 1630.2(j)(2).*

Plaintiff has presented sufficient evidence that she is substantially limited in the major life activity of caring for herself. She presented medical testimony concerning the rapid mental cycling characteristic of her disability. Dr. Kaye testified via deposition that, when plaintiff would cycle down to extreme depression, it would normally last for weeks at a time and result in plaintiff "taking to bed, she would just not be able to get herself up and dressed and bathed and she would stay in bed." (D.I. 38 at B-169) The expert testimony provides prima facie evidence that while in her depressive states, plaintiff was substantially limited in a major life activity.

However, plaintiff failed to present evidence that she is "significantly restricted" in a class of jobs or in a broad range of jobs compared to the average person. There is no evidence comparing plaintiff's ability to work with the average person having comparable skills, training, and abilities. Lastly, there is no medical or vocational expert testimony confirming that plaintiff's purported disabilities prevent her from working in a class or broad range of jobs. In fact, the evidence shows that, despite her disability, plaintiff was able to perform her job successfully for a number of years.


2. Being Regarded as Disabled

To be regarded as disabled, an employer must mistakenly believe "that the person's actual, non-limiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., 527 U.S. 516, 522, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).* The EEOC regulations provide that being "regarded as having such an impairment" means that an individual: (1) has a physical or **mental impairment** that does not substantially limit major life activities but is treated by a covered entity as constituting such a limitation; (2) has a physical or **mental impairment** that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments defined in this section but is treated by a covered entity as having a substantially limiting impairment. *Id. § 1630.2(1)(1)-(3).* Analysis of this claim focuses not on the individual and his or her

abilities but on the employer's perception of the individual. *Kelly v. Drexel Univ.,* 94 F.3d 102, 108-9 (3d Cir.1996). Something more than the employer's mere knowledge of the disability is necessary to sustain a "regarded as" claim. *Id.* As the regulations indicate, the employer must treat the individual as disabled.

In support of her claim, plaintiff points to a comment made during the People Issue meeting, where it was stated that during her disability leave, plaintiff was noncompliant with her medical treatment. The group also considered plaintiff's attendance but not her years of excellent performance. (D.I. 38 at A-94) The determination was to "utilize employment reason of prior absence notice to turn down applicant." (*Id.*) This evidence is sufficient to create a genuine issue of material fact as to whether defendant, who discussed, considered and possibly utilized plaintiff's disability in its decision not to rehire plaintiff, regarded plaintiff as disabled.

### B. Defendant's Legitimate, Non-discriminatory Reasons

*7 Plaintiff has established a prima facie case of disability under the **ADA**. The burden shifts to defendant to offer a legitimate, non-discriminatory reason for firing and/or failing to re-hire plaintiff. Defendant has offered evidence of its job security policy which terminates employment of an employee who has been out of work for over twelve months. Here, plaintiff was out of work for approximately two and a half years and, accordingly, her employment benefits expired upon her authorization to return to work. Additionally, in deciding whether to rehire plaintiff, defendant followed its policy by reviewing her personnel file which contained two absence notices, a disciplinary action and two excellent performance reviews. Defendant contends that plaintiff's noncompliance with her medical treatment was a relevant consideration as to plaintiff's performance and conduct and did not disclose any specific medical information. (D.I. 38 at B-220) Lastly, defendant refused to rehire plaintiff based on her attendance issues, which is a valid managerial decision.

The burden thus shifts to plaintiff to rebut defendant's non-discriminatory reasons. Plaintiff contends that defendant's decision not to rehire her was based upon the noncompliance comment made at the People Issue's meeting, rather than her attendance record. She provides the minutes from the meeting, which state "this particular person has considerable issues of

non-compliance with Health Service treatment plans. They were on absence notice in the past." (D.I. 34 at A-144) The outcome was to "utilize employment reason of prior absence notice to turn down applicant." (*Id.*) Additionally, plaintiff claims that her excellent performance reviews were not considered in making the decision. (D.I. 33 at 23) It is a proper question for the jury whether defendant's proffered justifications are worthy of credence or whether the true reason for the employer's act was discrimination. Accordingly, defendant's motion for summary judgment is denied.

### V. CONCLUSION

At Wilmington this 31st day of March, 2005, for the reasons stated;

IT IS ORDERED that defendant's motion for summary judgment is denied. (D.I.32)

D.Del.,2005.
Tribuani v. MBNA America Bank N.A.
Not Reported in F.Supp.2d, 2005 WL 885239 (D.Del.), 16 A.D. Cases 1167, 30 NDLR P 63

END OF DOCUMENT

# EXHIBIT G

HOME ⌂ TOC ☰ COMMENT ✕

**DEPARTMENT OF EDUCATION**

<strong>14 DE Admin. Code</strong> 1105

Statutory Authority: 14 Delaware Code,

Section 122(d) (14 **Del.C.** §122(d))

**PUBLIC NOTICE**

**Education Impact Analysis Pursuant To 14 Del.C. Section 122(d)**

<strong>1105 School Transportation</strong>

S004

**A. Type of Regulatory Action Required**

Amendment to Existing Regulation

**B. Synopsis of Subject Matter of the Regulation**

The Secretary of Education seeks the consent of the State Board of Education to amend 14 **DE Admin. Code** 1105. The amendments are necessary in order to clarify the reimbursement procedure for school bus ownership and contracts concerning payment dates in section 13.2.1 and for fuel adjustments in section 13.7. The reference to parents in 4.2.11, 6.1, 6.4, 8.6, 11.1.1, 11.1.1.1, 11.2.1, 15.1, 19.7 and 19.9 is also amended to parents, guardians and Relative Caregivers.

**C. Impact Criteria**

1. Will the amended regulation help improve student achievement as measured against state achievement standards? The amended regulation addresses payment procedures and fuel adjustments for school bus owners and contractors not student achievement.

2. Will the amended regulation help ensure that all students receive an equitable education? The amended regulation addresses payment procedures and fuel adjustments for school bus owners and contractors not equitable education issues.

3. Will the amended regulation help to ensure that all students' health and safety are adequately protected? The amended regulation addresses payment procedures and fuel adjustments for school bus owners and contractors not health and safety issues.

4. Will the amended regulation help to ensure that all students' legal rights are respected? The amended regulation addresses payment procedures and fuel adjustments for school bus owners and contractors not students' legal rights.

5. Will the amended regulation preserve the necessary authority and flexibility of decision making at the local board and school level? The amended regulation will preserve the necessary authority and flexibility of decision making at the local board and school level.

6. Will the amended regulation place unnecessary reporting or administrative requirements or mandates upon decision makers at the local board and school levels? The amended regulation will not place unnecessary reporting or administrative requirements or mandates upon decision makers at the local board and school levels.

7. Will the decision making authority and accountability for addressing the subject to be regulated be placed in the same entity? The decision making authority and accountability for addressing the subject to be regulated will remain in the

same entity.

8. Will the amended regulation be consistent with and not an impediment to the implementation of other state educational policies, in particular to state educational policies addressing achievement in the core academic subjects of mathematics, science, language arts and social studies? The amended regulation will be consistent with and not an impediment to the implementation of other state educational policies, in particular to state educational policies addressing achievement in the core academic subjects of mathematics, science, language arts and social studies.

9. Is there a less burdensome method for addressing the purpose of the regulation? There is no less burdensome method for addressing the purpose of the regulation?

10. What is the cost to the State and to the local school boards of compliance with the regulation? There is the no additional cost to the State and to the local school boards of compliance with the regulation.

## 1105 School Transportation

### 1.0 Responsibilities of Local Superintendents:

Local District Superintendents or their designees shall assume the following responsibilities concerning the transportation of students:

1.1 Implement state school transportation regulations. Local school disciplinary policies shall include pupil behavior and discipline on the school bus.

1.2 Define and coordinate changes to school transportation operations impacting local district budget allocations with the Department of Education.

1.3 Provide resource material and encourage teachers to include instruction in passenger safety in the school curriculum.

1.4 Provide for close and continuous supervision of the unloading and loading zones on or near the school plant, and of the emergency drills.

1.5 Provide supervision for those students whose bus schedules require them to arrive at school before classes begin and remain after classes terminate.

1.6 Promote public understanding of, and support for the district's school transportation program.

1.7 Assume prime responsibility for student conduct.

### 2.0 Conditions for School Bus Contractors:

School Bus Contractors shall agree to the following conditions in their contracts:

2.1 Follow all applicable federal, state, and local school bus regulations and policies.

2.2 Communicate effectively with the district transportation supervisor.

2.3 Dismiss a school bus driver when it can be shown that the driver is not satisfactorily performing driver tasks. District transportation supervisors may restrict a driver from operating in their school district.

2.4 Pay drivers and aides and provide substitute drivers and aides.                    S005

### 3.0 Responsibilities of School Bus Drivers:

Local school districts shall have a policy concerning the responsibilities of school bus drivers which, at a minimum, includes the following:

3.1 A statement that the school bus driver is in full charge of the bus and pupils, has the authority of a classroom teacher and is responsible for the health, safety, and welfare of each passenger.

3.2 Statements listing the following specific responsibilities of the bus driver:

3.2.1 Operate the school bus in a safe and efficient manner.

3.2.2 Conduct pre-trip and post-trip checks on the vehicle.

3.2.3 Establish and maintain rapport with passengers.

3.2.4 Maintain discipline among passengers.

3.2.5 Meet emergency situations effectively.

3.2.6 Communicate effectively with district and school staff.

3.2.7 Maintain effective contact with the public.

3.2.8 Complete reports as required by the state or school district.

3.2.9 Complete required training programs satisfactorily.

3.2.10 Refrain from using profane or indecent language or tobacco while on duty.

3.2.11 Dress appropriately.

3.2.12 Pickup and drop-off students at designated stops.

3.2.13 Submit to periodic random drug and alcohol testing and be subject to actions specified in the Delaware Code and in federal requirements.

3.2.14 Report suspected cases of child abuse to the school principal or designated official.

3.2.15 Notify the district transportation supervisor of any school bus accident.

3.3 A statement requiring a report of a physical examination on forms designated by the Department of Education.

**4.0 Qualifications and Responsibilities of School Bus Aides**

4.1 Qualifications for School Bus Aides include the following and shall apply to all new applicants and for any person whose employment as an aide has lapsed for a period of over one year.

4.1.1 Be at least 18 years of age.

4.1.2 Be fingerprinted to allow a criminal history check at both state and federal level and meet the same requirements (pre-licensing) specified for school bus drivers in the **Delaware Code**.

4.1.3 File with the district transportation supervisor a notarized affidavit (the same as the school bus driver affidavit) attesting to acceptable criminal history pending an official state and federal criminal record report.

4.1.4 Submit to the federal drug and alcohol testing procedures established for school bus drivers.

4.2 Local school districts shall have a policy concerning school bus aides which, at a minimum, lists the following responsibilities:

4.2.1 Assist in loading and unloading of students, including lift operation.

# EXHIBIT H

# DELAWARE SCHOOL BUS DRIVER PHYSICAL EXAMINATION

Date: _7/1/03_ ✓

☐ Annual Physical  ☒ First Time Physical (Tuberculin Test Required)

Print Name: _DISMORE_ _FRANK_ _S_    Driver License No. _____ State _DEL_
      Last     First     M.I.

C.  Address: _1 CROSS GATE DR._    Social Security No. _____ Birth Date _____
      Street

_SEAFORD_ _DEL_ _19973_ _(302) 629-4956_
     City     State     Zip     Phone Number

## Part I  MEDICAL HISTORY
(To be completed by applicant prior to physical examination)

| No | Illness, Disability, Etc. | Yes | If Yes, Give Diagnosis, Frequency, Extent and Severity | Date |
|----|---------------------------|-----|--------------------------------------------------------|------|
| ✓ | Neurological condition | | | |
| ✓ | Seizure or other alteration of consciousness | | | |
| ✓ | Head or spinal injury or illness | | | |
| ✓ | Psychiatric disorder | | | |
| ✓ | Acute or chronic eye disease | | | |
| ✓ | Chronic lung or respiratory disease | | | |
| ✓ | Tuberculosis | | | |
| ✓ | Cardiovascular disease | | | |
| ✓ | High blood pressure | | | |
| ✓ | Gastrointestinal disorder | | | |
| ✓ | Diabetes | | | |
| ✓ | Asthma or other severe allergies | | | |
| ✓ | Impairment or limitation of use of limbs | | | |
| ✓ | Kidney disease | | | |
| | Present medications | | | |
| ✓ | Recent weight loss or weight gain | | | |
| | Other | | | |

I certify that all the above information is true and correct:

Applicant _____    Physician Review _____

DEPOSITION EXHIBIT
PENGAD 800-531-6989
Dismore 2
1-22-07 KF

## Part II  PHYSICAL EXAMINATION

The purpose of the physical examination is to detect the presence of physical and/or mental defects of such a character and extent as to affect the applicant's ability to safely perform the required duties of a school bus driver in normal and/or emergency circumstances. (The bus driver's duties are listed on the next page.) Defects may be recorded, which do not, because of their character or degree, indicate that a certificate of physical fitness be denied. The TB screening is required every 5 years.

General Appearance _Fair_    Height _76"_   Weight _275_

VISION: (Distance) Right 20/ _40_  Left 20/ _40_    Without Glasses _X_  With Glasses

Color Vision _G-NL_  Horizontal Field of Vision _N/L_ Right _90°_  Left _90°_

HEARING: (Twenty feet) Right Ear _20_ /20  Left Ear _20_ /20  Disease or Injury _0_

THORAX: Heart (Murmurs) _0_    Lungs _clean_

Blood Pressure _130/60_  Pulse: Before exercise _88_    Two minutes after exercise _92_
    (Sitting)    (Rate & Rhythm)    (Rate & Rhythm)

ABDOMEN: Abnormal masses _0_ Tenderness _0_ Hernia: Yes _____ No _✓_ Where? _____

REFLEXES:  Upper Extremities: Normal _✓_  Abnormal _____  Lower Extremities: Normal _✓_  Abnormal _____

EXTREMITIES (Limitations) :Upper _0_  Lower _0_  Spine _0_ _applied 5/1/03_

LABORATORY FINDINGS:  (Urine) Spec. Gr. _1.010_  Albumin _(−)_  Sugar _0_  Tuberculin Test _applied 5/1/03_  Date/Result

(OVER)

# MEDICAL EXAMINATION REPORT FOR COMMERCIAL DRIVER FITNESS DETERMINATION (INSTRUCTIONS ON 4TH COPY) PAGE 1

## 1. DRIVER'S INFORMATION DRIVER COMPLETES THIS SECTION

**DRIVER'S NAME (LAST, FIRST, MIDDLE)**  Dismore Frank S

**SOCIAL SECURITY NO.** — — —

**BIRTHDATE** M D Y

**AGE** 48

**SEX** [X] M [ ] F

[X] NEW CERTIFICATION
[ ] RECERTIFICATION
[ ] FOLLOW UP

**DATE OF EX** 9/9/

**ADDRESS** 1 Crossgate Dr.

**CITY** Seaford

**STATE** Del.

**ZIP CODE** 19973

**WORK TELEPHONE:**

**HOME TELEPHONE:** 629-4956

**DRIVER LICENSE NO.**

**LICENSE CLASS**
[ ] A   [ ] C
[X] B   [ ] D
[ ] OTHER

**ISSUE** DE

## 2. HEALTH HISTORY DRIVER COMPLETES THIS SECTION, BUT MEDICAL EXAMINER IS ENCOURAGED TO DISCUSS WITH DRIVER.

Yes No
- [ ][X] Any illness or injury in the last 5 years?
- [X][ ] Head/Brain injuries, disorders or illnesses
- [X][ ] Seizures, epilepsy
- [ ][ ] Medication _____
- [X][ ] Eye disorders or impaired vision (except corrective lenses)
- [X][ ] Ear disorders, loss of hearing or balance
- [X][ ] Heart disease or heart attack; other cardiovascular condition
- [ ][ ] Medication _____
- [X][ ] Heart surgery (valve replacement/bypass, angioplasty, pacemaker)
- [X][ ] High blood pressure Medication _____
- [X][ ] Shortness of breath

Yes No
- [ ][X] Lung disease, emphysema, asthma, chronic bronchitis
- [ ][X] Kidney disease, dialysis
- [ ][X] Liver disease
- [ ][X] Digestive problems
- [ ][X] Diabetes or elevated blood sugar controlled by:
  - [ ] Diet
  - [ ] Pills
  - [ ] Insulin
- [X][ ] Nervous or psychiatric disorders, e.g., severe depression
- [ ][X] Medication Tristeer
- [ ][X] Loss of, or altered consciousness

Yes No
- [ ][X] Fainting, dizziness
- [ ][X] Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring
- [ ][X] Stroke or paralysis
- [ ][X] Missing or impaired hand, arm, foot, leg, finger, toe
- [ ][X] Spinal injury or disease
- [ ][X] Chronic low back pain
- [ ][X] Regular, frequent alcohol use
- [ ][X] Narcotic or habit forming drug use
- [ ][X] Muscular disease

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation.
List all medications (including over-the-counter medications) used regularly or recently.

_____

_____

DEPOSITION EXHIBIT
Dismore 3
1-22-07 KP
PENGAD 800-631-6989

## MUST BE READ AND SIGNED BY DRIVER

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.

**DATE** 9-9-04     **DRIVER'S SIGNATURE** F. S. Dismore

## MEDICAL EXAMINER'S COMMENTS ON HEALTH HISTORY

The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the counter medications, while driving.

_____

S052

# TESTING (Medical Examiner completes Sections 3 through 7)

## 3. VISION

STANDARD: At least 20/40 acuity (Snellen) in each eye with or without correction. At least 70° peripheral in horizontal meridian measured in each eye. The use of corrective lenses should be noted on the Medical Examiner's Certifica
INSTRUCTIONS: When other than the Snellen chart is used, give test results in Snellen-comparable values. In recording distance vision, use 20 feet as normal. Report visual acuity as a ratio with 20 as numerator an the smallest type read at 20 feet as denominator. If the applicant wears corrective lenses, these should be worn while visual acuity is being  tested. If the driver habitually wears corrective lenses, or intends to do so whil driving, sufficient evidence of good tolerance and adaptation to their use must be obvious. Monocular drivers are not qualified.

### NUMERICAL READINGS MUST BE PROVIDED.

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION |
|---|---|---|---|
| Right Eye | 20/ | 20/ 20 | Right Eye | ° |
| Left Eye | 20/ | 20/ 20 | Left Eye | ° |
| Both Eyes | 20/ | 20/ | | |

Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors? [X] Yes [ ]

Applicant meets visual acuity requirement only when wearing [ ] Corrective Lens

Monocular Vision: [ ] Yes [ ] No

Complete next line only if vision testing is done by an ophthalmologist or optometrist

| DATE | NAME OF OPHTHALMOLOGIST OR OPTOMETRIST (PRINT) | TELEPHONE NO. | LICENSE NO. | STATE OF ISSUE | SIGNATURE |
|---|---|---|---|---|---|
| | | | | | |

## 4. HEARING

STANDARD: A) Must first perceive forced whispered voice ≥ 5 ft., with or without hearing aid, or b) average hearing loss in better ear ≤ 40 dB
[ ] Check if hearing aid used for tests.   [ ] Check if hearing aid required to meet standard.
INSTRUCTIONS: To convert audiometric test results from ISO to ANSI , -14 dB from  ISO for 500 Hz, -10dB for 1,000 Hz, -8.5 dB for 2,000 Hz. To average , add the readings for 3 frequencies tested and divide by

### NUMERICAL READINGS MUST BE RECORDED.

| | | | Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|---|---|---|
| | | | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| a) Record distance from individual at which forced whispered voice can first be heard. | Right Ear Feet | Left Ear Feet | b) If audiometer is used, record hearing loss in decibels. (acc. to ANSI Z24.5-1951) | | | | | |
| | | | | | | | | |
| | | | Average: | | | Average: | | |

# EXHIBIT I

**Transportation Office**
390 N. Market Street Ext.
Seaford, DE  19973
(302) 629-4587  Ext 210/211


DATE:       October 18, 2005

TO:         Frank Dismore File

FROM:       L. J. Saltarelli, Transportation Supervisor

RE:         Termination


On September 30, 2005, Frank Dismore was terminated as a bus driver for the
Seaford School District by Larry Saltarelli for misconduct.


S001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRANK DISMORE,                          )
                                        )    No. 06-437 (SLR)
                    Plaintiff,          )
                                        )
        v.                              )
                                        )
SEAFORD SCHOOL DISTRICT,                )
                                        )
                    Defendant.          )

### CERTIFICATE OF SERVICE

I, Jennifer M. Becnel-Guzzo, Esquire, hereby certify that on May 24, 2007, I electronically filed **Defendant Seaford School District's Motion for Summary Judgment, Opening Brief in Support of Its Motion for Summary Judgment, Exhibits, and Proposed Order** with the Clerk of Court using CM/ECF and served same upon the following via UPS Overnight Delivery:

    Frank Dismore
    1 Crossgate Drive
    Seaford, Delaware 19947

                            BUCHANAN INGERSOLL & ROONEY PC


                            Jennifer M. Becnel-Guzzo, Esquire (#4492)
                            The Brandywine Building
                            1000 West Street, Suite 1410
                            Wilmington, DE 19801
                            (302) 552-4200
                            (302) 552-4295 (facsimile)
                            jennifer.becnelguzzo@bipc.com
                            *Attorneys for Defendant Seaford School District*

May 24, 2007